UNITED STATES, Appellee,

v.

Freddy ROMERO, Defendant–Appellant.

UNITED STATES, Appellee,

v.

Armando TEJEDOR, Defendant–Appellant.

UNITED STATES, Appellee,

v.

Gabriel CURVELO, Defendant–Appellant.

UNITED STATES, Appellee,

v.

Oranie GALINDO–FORBES, Defendant–Appellant.

Nos. 93–2187 to 93–2190.

United States Court of Appeals, First Circuit.

Heard June 10, 1994.

Decided Aug. 29, 1994.

Jorge L. Arroyo, by Appointment of the Court, for appellant Freddy Romero.

José A. León–Landrau, by Appointment of the Court, for appellant Armando Tejedor.

Carlos A. Vázquez–Alvarez, Asst. Federal Public Defender, with whom Benicio Sánchez–Rivera, Federal Public Defender, was on brief, for appellant Gabriel Curvelo.

Luis A. Medína–Torres, by Appointment of the Court, for appellant Oranie Galindo–Forbes.

· Richard A. Friedman, Atty., Appellate Section, Crim. Div., U.S. Dept. of Justice, with whom Guillermo Gil, U.S. Atty., Rosa E. Rodríguez–Vález, and Antonio R. Bazán, Asst. U.S. Attys., were on brief, for appellee.

Before TORRUELLA, CYR and BOUDIN, Circuit Judges.

TORRUELLA, Circuit Judge.

In this case, defendants-appellants Freddy Romero, Gabriel Curvelo, Armando Tejedor, and Oranie Galindo Forbes appeal their convictions for possessing, while aboard a vessel subject to the jurisdiction of the United States, cocaine intended for distribution in violation of 46 U.S.C.App. § 1903(a). The defendants challenge the sufficiency of the evidence and the trial court's jury instructions. Defendant Romero challenges his sentence. We affirm.

## I. *BACKGROUND*

On the morning of March 29, 1993, a U.S. Navy surveillance aircraft, a P3 Orion (the "P3"), on routine narcotics-interdiction patrol, received a signal on its radar indicating the presence of a vessel in international waters south of the Dominican Republic. The radar indicated that the area was free of other surface vessels within a hundred-mile radius. Crewmen aboard the aircraft subsequently spotted the boat through observer windows from a distance of five miles. Two crewmen, pilot Jody Bridges and aft observer William Pikul, recognized the boat as a low-profile vessel of the type used to smuggle narcotics.

The P3 circled and proceeded to make several passes over the boat, which, at that point, abruptly turned around and accelerated in the opposite direction. During one pass, the crewmen observed two people on the vessel's deck tossing bales overboard. Subsequently, small arms tracer rounds came streaming toward the plane. Throughout this time, the boat was moving at high speed in an evasive, zig-zag course. The aircraft continued to trail the vessel until, six hours later, the boat ran out of fuel and three of its crew were observed attempting to rig a blue canvas tarp to act as a sail.

Throughout the surveillance, the crew of the aircraft maintained the boat in sight through binoculars. The P3 also had sophisticated surveillance equipment and cameras, and over 200 pictures were taken showing the boat and the bales in the water. None of the photographs showed bales on the boat, individuals on the boat, or bales being thrown overboard. The P3 also dropped special buoys to mark the location of the bales after they were thrown overboard.

While the occupants of the boat were rigging their sail, a helicopter from the USS TAYLOR, a Navy frigate, arrived and kept the boat under surveillance until the TAYLOR itself reached the boat at dusk. The law-enforcement officer aboard the TAYLOR, Coast Guard Lieutenant Francisco Alterie, hailed the boat by megaphone and asked for its nationality because no national identification was evident. Defendant Forbes, who subsequently appeared to be in charge, told Alterie that the boat was Colombian.

Alterie requested by radio that his superiors obtain a "statement of no objection," which is a statement from the United States State Department indicating that the country of registry, in this case Colombia, granted American officials permission to enforce United States laws aboard that vessel. After obtaining permission from Colombian officials to board the defendants' boat for purposes of determining the vessel's nationality and conducting a basic inspection, the State Department authorized Alterie to board the defendants' vessel.

Once on board, Alterie and his boarding party found, in addition to the four defendants themselves, state-of-the-art radar and communications equipment, ropes crossing the cargo area, and a strong smell of gasoline and other indications that the cargo area had been washed down with gasoline. No drugs or other contraband were found on the boat or on the defendants. The boat did not have any identification or registration papers. Upon being advised of this fact, the Colombian government "refuted the claim of Colombian registry" for the vessel.

Meanwhile, twenty-one bales were recovered from the Caribbean during the afternoon of March 30 by the Coast Guard Cutter ATTU, approximately 15 nautical miles from the location where the P3 first spotted the defendants' vessel 27–28 hours earlier. The bales contained numerous two-kilogram

packages of cocaine. The Coast Guard had notified the ATTU of the bales on the previous afternoon (March 29) and the ATTU had reached the general location of the drop and the buoys left by the P3 at approximately midnight. The ATTU was unable to find the bales during the night, but it did find them the next day after a Coast Guard patrol aircraft located them 15 miles away.

After retrieving the bales of cocaine, the ATTU rendezvoused with, and then relieved, the TAYLOR at the site of the defendants' vessel. On March 31, the State Department authorized defendants' arrest. Coast Guard officials on the ATTU then arrested the defendants and brought them and their boat to the port of Mayaguez, Puerto Rico. Officials with a mobile laboratory conducted tests to determine if drugs were present on the defendants and on the boat at that time. Both the defendants and their vessel tested positive for traces of cocaine.

## II. ANALYSIS

### A. Sufficiency of the Evidence

█ The defendants challenge the sufficiency of the evidence supporting their convictions. In particular, they claim the government did not establish that they ever possessed the cocaine that the Coast Guard recovered from the ocean and that the government later submitted as evidence at trial. One of the elements of an offense under 46 U.S.C.App. § 1903 is that the defendants knowingly or intentionally possessed a controlled substance. *United States v. Piedrahita–Santiago*, 931 F.2d 127, 130 (1st Cir. 1991).

█ In reviewing whether the evidence is sufficient to establish that the defendants possessed the bales of cocaine, we must consider all the evidence in the record as a whole, including all reasonable inferences therefrom, in the light most favorable to the verdict, with a view to whether a rational trier of fact could have found the element of possession beyond a reasonable doubt. *United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir.1994); *United States v. Matiz*, 14 F.3d 79, 82 (1st Cir.1994); *United States v. Sepúlveda*, 15 F.3d 1161, 1173 (1st Cir.1993).

We must also defer to the jury with respect to all credibility determinations. *O'Brien*, 14 F.3d at 706.

The government's evidence of possession was ample, as it supported a reasonable inference that the bales observed being thrown overboard from defendants' boat were the same bales later recovered by the Coast Guard from the water in the vicinity where the boat had been seen. Crewmen from the P3 testified that they saw people aboard the defendants' boat throw bales from the vessel overboard into the water. Crewman Pikul testified that the bales presented in evidence at trial were the same ones he witnessed being tossed overboard. Photographs from the P3 showed the same bales in the water that were present in the courtroom. Both Pikul and the P3's pilot, Bridges, testified that the defendants' boat tried to evade the P3 and even fired upon the surveillance aircraft. Both also testified that the boat was of the type commonly used for drug smuggling.

Lieutenant Alterie and his boarding party found lines crossing the cargo area of defendants' boat indicating that something had been tied there. They also found that the cargo area of the defendants' boat had been washed down with gasoline, a tactic which several government witnesses explained was a common technique among narcotics smugglers to eradicate traces of contraband substances. Thomas Friend, a Navy helicopter pilot and search and rescue officer, testified that the bales of cocaine were found the following day within a predictable area of where one would expect them to be had they come from defendants' boat. Friend based this conclusion on a consideration of the wind conditions, water currents, and elapsed time. The radar on the P3 and on the TAYLOR's helicopter showed that no other boats were within a 100–mile radius of defendants' boat. This evidence was sufficient, even without any consideration of the fact that defendants and their boat tested positive for cocaine after they were brought to the port of Mayaguez, to establish that defendants knowingly possessed cocaine in violation of 46 U.S.C.App. § 1903.

Defendants argue that (1) the eyewitness accounts of the P3's crewmen that defendants threw the bales overboard should not be credited because the aircraft failed to take any pictures of the event, and because the P3's principal observer misidentified the color of the recovered bales; (2) the testimony concerning the likelihood that the bales recovered from the ocean came from defendants' boat in light of ocean and weather conditions was inherently unreliable; and (3) the tests showing traces of cocaine on the defendants and their boat were inaccurate due to unreliable equipment and careless procedures allowing for contamination of the test subjects.

■ Defendants' first claim is that no reasonable jury could credit the testimony of the P3 crewmen because the very sophisticated photographic equipment in the P3 did not yield a single photograph of individuals on the vessel, bales on the vessel, bales being thrown from the vessel, or bales in the water next to the vessel. Defendants point out that the P3 had the defendants' vessel under continuous surveillance during the alleged dumping, that the P3 was prepared to, and did, take photographs throughout its encounter with defendants' boat, and that one of the P3's cameras produced instant still photos which allowed the crewmen to make adjustments in the photography while they were taking the pictures. These facts conclusively establish, defendants conclude, that the eyewitness accounts of the bales on defendants' vessel are not credible.

We need recount only a few of the many potentially reasonable inferences that a jury could make in crediting the government's eyewitness testimony in the absence of photographs directly linking the bales of cocaine to the defendants. The jury could reasonably infer that the photographer (who did not testify at trial) simply missed the opportunity to take pictures at the crucial time when the bales were being thrown overboard because of the position of the aircraft (which made a number of "passes" over the boat) or because of the position and readiness of the camera equipment. The jury could also rationally conclude that the photographer failed to take the "missing" pictures by mistake, perhaps because he did not use the equipment properly, had poor aim, or because he improperly developed the film and ruined the crucial photographs. Pikul and Bridges testified that one of the two cameras on the P3, a special high-speed camera, was broken and that none of its photographs came out. It would be perfectly rational for a jury to conclude that this broken camera was the camera used for the crucial photographs and that the second camera, the one whose pictures were used at trial, was only used before and after the bales were dumped in the water.

■ The defendants next claim that Pikul's testimony that the bales in the courtroom were the same bales that he had seen earlier on defendants' boat cannot be credited by a reasonable jury because Pikul said in an earlier statement that the bales were "yellow" when in fact the bales were closer to a brownish color. At trial, Pikul described the bales as a "yellowish-brown" in order to mask, defendants' allege, the "contradiction" between the earlier statement and the appearance of the evidence in court.

Credibility determinations are firmly within the jury's realm, *O'Brien,* 14 F.3d at 706. We will not secondguess the jury's decision to credit testimony which contains an inconsistency, especially in a situation like this one where the inconsistency or "contradiction" is ambiguous. It would usurp the jury's role to reject its decision to believe or disbelieve a witness because of such inconsistencies.

■ Defendants next attempt to poke holes in Friend's testimony that if the bales were dumped from the defendants' vessel, they should have been found in the area where they were actually located, 28 hours later. Defendants claim that, at trial, Friend was initially unable to provide and explain the formula used by the Navy and the Coast Guard in their search for the bales, which was determined prior to the launching of the search. After a lunch recess at trial, Friend returned to explain the formula and carried out a sample calculation demonstrating the area of probability where the bales were found. Defendants maintain that Friend was unable to explain how the number 28, repre-

senting the number of hours that it took the combined Navy and Coast Guard task force to locate the bales in the water upon their having been allegedly dumped from the suspect vessel, could have been factored into the formula *prior* to the search. The defendants emphasize that that number could not have been available to the searchers before they calculated where to attempt to locate the bales.

Defendants further point out that the defendants' vessel was under constant surveillance in the area during and after the purported dumping and that the bale area was marked by buoys. If the bales were indeed dumped from that vessel, defendants argue, it should not have taken that many ships and aircraft 28 hours to find them. This, of course, although a valid argument, is properly made to the jury rather than to an appellate court.

None of defendants' objections raise colorable challenges to the sufficiency of the evidence. Despite some confusion surrounding Friend's rather technical testimony, it was relatively clear from our reading of the transcript that Friend's calculations represented an after-the-fact demonstration of (1) how search patterns are calculated in general and (2) where the bales in this case should have been found had the defendants in fact dumped them. Friend stated several times that the actual search was done by feeding certain information into a computer which then calculated where to search. Friend testified that the computer kept track of elapsed time during the actual search. The jury could conclude from this that the search was properly conducted at the time and that the bales did originate from defendants' boat.

As for the 28 hours it took the Navy and the Coast Guard to find the bales, we cannot tell from the record if this is a suspiciously delayed period of time or a relatively quick period of time to find some bales floating in the ocean. A reasonable jury, however, could rationally have found that the bales were recovered relatively quickly and recovered right where one would expect them to be, had the bales drifted in the Caribbean for a day after the defendants threw them overboard.

█ Finally, defendants assert that the two types of tests used for detecting cocaine on the defendants and their boat, the Barringer Ion Scan and the Sentor Gas Chromatography, were inherently unreliable. This assertion is based on the claim that, although the testing technology has been used for years, the mobile, in-the-field testing instruments used for the two tests in Mayaguez were relatively recent creations and had not yet been proven to be reliable. Defendants also claim that Coast Guard officials took no prophylactic measures to prevent post-arrest contamination of the defendants and their boat from the cocaine bales, which the Coast Guard transported together with the defendants, and from other potential sources of contamination.

Defendants do not challenge the admissibility of the testing evidence. Rather, they maintain the testing evidence is too unreliable to support a jury verdict. We find that defendants do raise some legitimate concerns regarding the government's testing procedures. However, because there was sufficient evidence to convict without consideration of the test results, we need not decide how reliable the test results were in this particular case. As we stated above, the other evidence of possession, linking the bales of cocaine to defendants' boat, was ample. We therefore reject defendants' challenge to the sufficiency of the evidence. Had the defendants raised a challenge to the admissibility of the evidence and presented a well-developed record on the problems with in-the-field testing equipment, we might have been more inclined to reach the merits of defendants' objection.

**B. Admissibility of the "Certification of Denial"**

█ Under 46 U.S.C.App. § 1903, it is unlawful for anyone "on board a vessel subject to the jurisdiction of the United States," 46 U.S.C.App. § 1903(a), to possess with intent to distribute a controlled substance. Vessels subject to United States jurisdiction include vessels "without nationality." 46 U.S.C.App. § 1903(c)(1)(A). The indictment in this case alleged that jurisdiction existed

because the defendants' vessel was a "vessel without nationality" within the meaning of 46 U.S.C.App. § 1903(c)(1)(A).

A "vessel without nationality" (also called a "stateless vessel") includes "a vessel aboard which the master or person in charge makes a claim of registry, which claim is denied by the flag nation whose registry is claimed." 46 U.S.C.App. § 1903(c)(2)(A). A claim of registry can include a verbal claim of nationality or registry by the master or person in charge. 46 U.S.C.App. § 1903(c)(3)(C). *United States v. Maynard,* 888 F.2d 918, 922–25 (1st Cir.1989); *United States v. Potes,* 880 F.2d 1475, 1478–79 (1st Cir.1989).

There is no dispute in this case that a "person in charge," namely defendant Forbes, made a claim of nationality by stating that the defendants' vessel was from Colombia. Since a claim of nationality was made, the vessel can be classified as "stateless" only if the claim is denied by the flag nation whose registry is claimed. 46 U.S.C.App. § 1903(c)(2)(A). *Maynard,* 888 F.2d at 925. Section 1903(c)(2) provides that:

A claim of registry under subparagraph (A) may be verified or denied by radio, telephone, or similar oral or electronic means. The denial of such claim of registry by the claimed flag nation *may be proved by certification of the Secretary of State or the Secretary's designee.*

46 U.S.C.App. § 1903(c)(2) (emphasis added).

To satisfy the jurisdictional requirement under § 1903, the government presented a "certification of denial" from the State Department as proof that defendants' claim of registry was denied by Colombia. That certificate was signed by the Acting Secretary of State and stated: "I Certify That Peter J. Boynton, whose name is subscribed to the document hereunto annexed, was at the time

of subscribing the Maritime Law Enforcement Officer [at the State Department], and that full faith and credit should be given to his acts as such." The annexed statement by Boynton attested to the fact that Boynton had been designated by the Secretary of State to make certifications of denial pursuant to 46 U.S.C.App. § 1903. Boynton stated that on March 30, 1993, he contacted the Defense Attache of the United States Embassy in Colombia to obtain permission from Colombian officials to board defendants' vessel and to determine its nationality. Boynton then recounted the following series of events: The American Defense Attache obtained permission to board the vessel from an Admiral H.G. Ramírez, Commandant of the Colombian Navy. The Attache then related this to U.S. Coast Guard officials who authorized a boarding of the vessel and who subsequently determined that the vessel had no indicia of nationality. This information was relayed back to Colombian officials, and on March 31, 1993, Admiral Ramírez wrote a letter to the American Attache refuting the defendants' claim of Colombian registry.[1] Boynton did not have personal knowledge of any of these events; rather, he was informed of them as the events unfolded by various State Department and Coast Guard officials. The actual letter from Admiral Ramírez refuting defendants' claim of nationality was never presented at trial.

At issue on appeal is defendants' allegation that the State Department certificate was inadmissible because it included double and triple hearsay concerning the fact of Colombia's denial of registry of defendants' boat, and because the form of the certificate—with Boynton's annexed statement containing critical facts that were not within Boynton's personal knowledge—was inherently unreliable.[2] Defendants argue that Boynton had no

---

1. The critical language in this case is Boynton's statement:

   4. I certify the following:

   . . . . .

   (e) Later on March 31, 1993, LCDR Dale of the U.S. Embassy in Bogotá contacted LT Pete DeCola of the Department of State and informed him that the Government of Colombia had refuted the claim of Colombian registry for the un[n]amed vessel, by letter signed by ADM

Ramírez, Commandant of the Colombian Navy.

2. The government argues that some of the defendants did not join defendant Romero's objection to the district court's admission in evidence of the State Department certification. Because we find no merit to the substance of Romero's objection, we need not determine whether all the defendants have preserved this ground for appeal.

personal knowledge of any of the relevant facts that may have occurred in Colombia with respect to the request for boarding the vessel or the Colombian government's reply to that request, including Colombia's refutation of the nationality of defendants' boat. Defendants conclude that the district court erred in admitting the Department of State certificate and that the government, therefore, failed to establish the element of jurisdiction under § 1903.

The district court did not err in admitting the Department of State Certificate because there was no hearsay or other admissibility problem with that piece of evidence. Section 1903(c)(2) specifically provides that "the denial of such a claim of registry by the claimed flag nation may be proved by certification of the Secretary of State or the Secretary's designee." The statute was designed to ease evidentiary requirements for the government by avoiding the time-consuming and burdensome task of obtaining official documentation from the claimed country of registry which was previously required to prove jurisdiction over a stateless vessel. *See United States v. Leuro–Rosas*, 952 F.2d 616, 619–20 (1st Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1598, 118 L.Ed.2d 313 (1992). Thus, to establish jurisdiction in the case of a vessel claiming foreign registry, the government need not prove that the vessel is in fact without registry in another country, nor must

it prove that the foreign nations' denial or refutation of registry is valid, legitimate, or otherwise properly made. In fact, such issues may be irrelevant for purposes of jurisdiction under § 1903 once it is established that the State Department certifies the vessel is stateless. *See* 46 U.S.C.App. 1903(d) ("A claim of failure to comply with international law in the enforcement of this chapter may be invoked solely by a foreign nation, and a failure to comply with international law shall not divest a court of jurisdiction or otherwise constitute a defense to any proceeding under this chapter"); *Leuro–Rosas*, 952 F.2d at 621–22.[3]

Jurisdiction exists under § 1903 if the State Department determines a vessel is stateless through the receipt of a denial of registry from a foreign nation. Section 1903(c)(2) allows for proof of this determination by way of a "certification" of the Secretary or his or her designee. The presence of what might normally be considered "hearsay" in the certification is explicitly contemplated by the statute, which states that a claim of registry "may be verified or denied by radio, telephone, or similar oral or electronic means." 46 U.S.C.App. § 1903(c)(2). Congress recognized that the State Department would be using non-documentary, non-self-authenticating means of obtaining a denial and attesting to this fact in its certification. Thus, the statute specifically autho-

---

**3.** We say that proof of actual registry or of the illegitimacy of a foreign nation's denial *may be* irrelevant because the statute can be read as defining jurisdiction solely in terms of what the State Department certifies, regardless of whether or not a defendant's boat is actually registered in a foreign nation. The government insists that § 1903(d) confirms this by stating that jurisdiction exists even in the face of an alleged violation of international law. According to the government, a defendant who wants to assert that his vessel is truly registered in a foreign nation or that that nation did not properly deny his claim registry, must protest to the foreign nation itself and have that nation take up the matter with the State Department on the defendant's behalf. We are not so sure that the statute indeed imposes such a burden. It is possible that proving the registry of a vessel for purposes of jurisdiction under the statute is not the same thing as contesting a violation of international law and thus not barred by § 1903. *See United States v. Aikins*, 946 F.2d 608, 615 (9th Cir.1990) (noting in dicta that defendants can rebut the facts presented in a State Department certification). Anyway,

we are not presented with such a situation in this case—defendants did not try to establish at trial that their vessel was in fact Colombian. Therefore, we do not decide the issue of whether efforts to prove a vessel's actual registry would be irrelevant under § 1903 or barred by § 1903(d).

This case does not, of course, present a challenge to the authenticity of the government's proffered State Department certification on the grounds that, for example, the certification was fraudulently prepared (e.g., untruthful in saying that a foreign nation's denial had been received) or presented in bad faith (e.g., accepting the denial of a janitor in a foreign nation's public agency instead of a public officer in that agency). We therefore reserve the question of whether § 1903(d), or any other provisions of § 1903, would bar the presentation of evidence relating to the facts of registry or the actions of foreign nations in situations that might warrant determination, probably by the court, as to whether a proper certification was being offered.

rizes as proof of the jurisdictional component of § 1903 precisely what the government presented here. The State Department certification recited with specificity the steps that resulted in the Department's understanding that "the Government of Colombia had refuted the claim of Colombian registry for the un[n]amed vessel, by letter signed by ADM Ramírez, Commandant of the Colombian Navy." This is sufficient to establish jurisdiction.

There is no hearsay or other problem with the form of the certification in this case. The attachment of a declaration by Boynton to the Secretary of State's certification is perfectly acceptable because Boynton constitutes the "Secretary's designee" under § 1903(c)(2). Several courts have accepted declarations attached to certificates as proper and admissible "certifications" under § 1903. *United States v. Aikins,* 946 F.2d 608, 614 (9th Cir.1990); *United States v. Mena,* 863 F.2d 1522, 1531 (11th Cir.), *cert. denied,* 493 U.S. 834, 110 S.Ct. 109, 107 L.Ed.2d 72 (1989) (finding admissible a letter from Honduran Navy attached to certification from United States Embassy in Honduras); *cf. Leuro–Rosas,* 952 F.2d at 618–21 (expressing approval of certification under § 1903 in the same form as the certification in this case).

Boynton's reliance on the actions and statements of other State Department officials in certifying Colombia's denial of registry does not raise admissibility problems under the hearsay rule. The State Department Certification falls squarely within Fed. R.Evid. 803(8)(A) which excepts from the hearsay rule public-agency statements "in any form" setting forth "the activities of the office or agency." Fed.R.Evid. 803(8)(A); *Mena,* 863 F.2d at 1531. The State Department's declaration that it received a denial of defendants' claim of registry from Colombia was a statement by a public agency setting forth a routine activity of that agency. The hearsay exception under Fed.R.Evid. 803(8)(A) accounts for all of the subsidiary statements relayed by the State Department operatives to the declarant, Boynton. *See Aikins,* 946 F.2d at 614–15 (noting that the authority of a certifying official who relies on

the statements of functionaries for his information "is not diluted, and the admissibility of his certificate is not diminished, because he indicated the basis for his statement"; and stating that "the Secretary of State could properly rely on those in his chain of command. A probability of trustworthiness attends the statement of the certifying officer; it is equally probable that the officer has taken reasonable measures to assure himself of the fact he certifies").

## C. Jury Instructions

■ Defendants argue that the district court's "reasonable doubt" instructions and its instructions on the elements of the crime were erroneous. Before trial, the district court judge described for the jury the reasonable doubt standard by comparing it to the civil, preponderance of the evidence standard. The judge instructed the jurors:

The government must prove each defendant guilty beyond a reasonable doubt. The defendants have no burden to prove their innocence or to present evidence or to testify. The law forbids you from considering the silence of an accused, his failure to testify, in reaching a verdict. That is a right that a defendant has. You cannot consider the silence of an accused in the face of an accusation. That is illegal. You cannot do that.

The government, as I said, must prove the case beyond a reasonable doubt. And let me explain in very simple terms what this means. Usually, at this stage of the case, what we judges do is concur [sic] the two standards, the one that applies in the civil case and one that applies in a criminal case, so that you will have an idea of the difference. At the end of the case I will explain this again to you.

In the civil case we say that a plaintiff prevails if he proves the case against the defendant by the preponderance of the evidence. Assume, then, a graphic example. A scale, an even scale. You will put the evidence of the plaintiff and the evidence of the defendant, if any, on the two sides and you see what happens to the scale. If the scale just moves a little bit to the plaintiff's side, the plaintiff is prevail-

ing in the context of a civil case. That could be a car accident case, a contracts case, preponderance of the evidence.

In the criminal context we say the government must prove each defendant guilty beyond a reasonable doubt. *That implies a heavier burden. Assume, then that the scale must tip more to the government's side, heavier burden.*

Why? Because liberty is involved and, of course, the wise people who devised the system understood that the evidence would be received under a different standard, as we say, beyond a reasonable doubt.

I will explain this once again for your benefit at the end of the case; but if you have ever served in a civil case, you should disregard the particular notion of preponderance. Here we say beyond a reasonable doubt. (emphasis added).

No objections were made at this time, or subsequently, concerning these instructions. After closing arguments, the court stated:

Each defendant is presumed to be innocent. Each defendant had no duty to testify or present any evidence or prove their innocence.

The government had the burden to prove each defendant guilty beyond a reasonable doubt, and that you know from the beginning.

What is this business of "reasonable doubt"? "Reasonable doubt" is a doubt based upon reason and common sense and may arise from a careful and impartial consideration of all the evidence in the case, or the lack of evidence in the case. Proof beyond a reasonable doubt is proof that leaves you firmly convinced that the defendants are guilty.

. . . .

So, proof beyond a reasonable doubt is proof that leaves you firmly convinced that had a given defendant has been proven guilty beyond a reasonable doubt [sic].

At the end of this charge, the defense attorneys approached the bench but no one objected to the reasonable doubt instructions.

Defendants argue that the instruction concerning the "even scale" is faulty for two reasons. First, it dilutes the degree of persuasion required to convict a defendant in a criminal case. Second, the "even scale" mechanism presupposes that the criminal defendant will submit evidence so as to balance the scale. According to the defendants, the fact that the government would usually submit more evidence than the defendant will, in the eyes of a reasonable juror, forcibly tip the scale to the government's side, even when such tipping is not sufficient to convict beyond a reasonable doubt. In comparing the criminal standard to the civil one, defendants contend that the court actually defined proof beyond a reasonable doubt as preponderance of the evidence, but with a "heavier burden." Defendants conclude that this dilutes the meaning of reasonable doubt.

■ Because defendants failed to raise this objection at trial, we must review the trial court's instructions for plain error. Fed.R.Crim.P. 52(b). We will find plain error only when (1) there is an "error," (2) that is "clear" or "obvious" and (3) that affects "substantial rights." *United States v. Olano,* — U.S. —, — – —, 113 S.Ct. 1770, 1776–77, 123 L.Ed.2d 508 (1993); *United States v. Colón–Pagán,* 1 F.3d 80, 81 (1st Cir.1993).

In this case, although the reasonable doubt instructions may be erroneous, we cannot find that they are clearly and obviously so. Reasonable doubt instructions are erroneous when, taken as a whole, they have a "reasonable likelihood" of misleading the jury to believe that it can convict on some lesser standard of proof than that required under the reasonable doubt standard. *Victor v. Nebraska,* — U.S. —, —, —, 114 S.Ct. 1239, 1243, 1251, 127 L.Ed.2d 583 (1994). Although the court's statement that "the scale must tip more to the government's side" may, if taken in isolation, suggest a somewhat diluted burden of proof, the court was clear that the reasonable doubt standard was distinct from, and imposed a "heavier burden" than, the preponderance standard used in civil trials. The court also told the jury several times that the defendants had no burden to prove their innocence, and that they did not have to present any evidence. This decreased the likelihood that the jury

would improperly weigh the evidence or lack thereof.

What little explanation the court gave on the term "reasonable doubt" was harmlessly circular. There was no mention in the final charge of the preponderance of the evidence standard. Although the use of the scale analogy has the potential for misleading the jury into applying a diluted burden of proof, we do not see in this case, with all the instructions taken as a whole, a clear and obvious likelihood that the jury would be so misled.

■ Defendants also argue that the district court erred in its instructions with respect to the elements of the crime because the instructions might have suggested to the jury that jurisdiction was not an element of an offense under § 1903. According to the defendants, the court's confusing instructions effectively failed to inform the jury that it must find that defendants' vessel was subject to the jurisdiction of the United States beyond a reasonable doubt. As with the reasonable doubt instruction, no objection was made at trial to the court's instructions on the elements of the crime.

We need not reach the substance of defendants' objection on this issue because the defendants presented no evidence at trial to refute the government's proof that the defendants' vessel was stateless and thus subject to the jurisdiction of the United States. Other than defendants' attempt to prevent the admission of the State Department certification, the issue of United States jurisdiction over their vessel was not contested. We agree with the Third Circuit that there is no plain error in a situation such as this one. *United States v. Martinez–Hidalgo*, 993 F.2d 1052, 1057 (3d Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 699, 126 L.Ed.2d 666 (1994) (finding no plain error when court refused to instruct jury on jurisdiction as an element to be proved under § 1903). Because the undisputed evidence conclusively established jurisdiction, the court did not undermine the fundamental fairness of the trial or contribute to a miscarriage of justice by failing to instruct the jury on that element of the crime. *Id.* Moreover, unlike in *Martinez–Hidalgo,* the court in the present case

at least attempted to give an instruction to the jury on the element of jurisdiction. There is thus less likelihood of plain error in this case than in *Martinez–Hidalgo.*

## D. Sentencing of Romero

■ Defendant Romero argues that the district court erred in finding that, as a matter of law, it was precluded from granting a downward departure in sentencing for "extraordinary family circumstances" under § 5K2.0 of the Sentencing Guidelines. Romero testified at his sentencing hearing that the mother of his children was murdered in Colombia in 1988. His three children presently live with his sister in Santa Marta, Colombia. The sister has four children of her own to take care of. They all live together in a small two-bedroom house. The sister's husband works only periodically. Romero's eldest daughter was suspended from school because Romero's sister and her husband could not make the monthly payments that the school required. Romero's son, Ronald Romero, suffers from a rare blood disease. Ronald's doctor recommended treatment with special pills and food as well as a blood transfusion. Romero did not know if his son Ronald had ever received the recommended treatments.

Following Romero's testimony, the court rejected any downward departure based on § 5K2.0 for unique family circumstances. The court stated:

You are going to 5K2.0, basically, and asking me to read within the context of this case a departure for unique family circumstances of the kind not normally or not taken into consideration by the Sentencing Commission when they drafted the guidelines.

But I do not think that that's the case. As a matter of fact, your request falls within the category that discourages departures that pertain to such things as family ties and family responsibilities, etcetera. I do not think that this case is so different from what I see in 90 percent of the cases. Take a look at what happened here today this afternoon. We have visions that are

as terrible and as depressing and as sad as the ones that he has now.

I cannot, on the basis of what I know of this record, and on the basis of what I heard here, make a substantial departure under that particular section. . . .

I do not think—I do not think that this stands as a situation that is so different from that that we see on a daily basis, which are very sensitive situations. Assuming no diseases, assuming no circumstances of that kind—the mere fact that a father, that of itself is extraordinary, but that is not what the law allows me to consider.

Romero's Attorney then stated:

Well, your Honor, precisely your Honor stated "assuming no diseases," and that is precisely why we raised the matter. It is what the probation officer called "a rare blood disease," and that is why we had, at the outset of our allocution, explained to your Honor the problems that we have encountered.

The court responded:

That's okay. But I am not assuming that that is true. I am assuming that what the child has is sickle-cell anemia. It could be sickle-cell anemia, it could be leukemia, but those two factors are not enough for me to depart.

Romero argues that the court's statement ("that is extraordinary, but that is not what the law allows me to consider") evinced the court's perception that it was legally unable to depart in the absence of "diseases" or "circumstances of that kind." According to Romero, the court's position was that on a record which did not include particular medical conditions, the court was legally precluded from departing. Yet the court then assumed Romero's son had a blood disease—either sickle-cell anemia or leukemia—and thus that an "unusual circumstance" was present. The court, however, still did not depart because, Romero claims, it thought that it could not legally do so under the circumstances of this case. Romero's interpretation of the court's decision is mistaken. We therefore uphold his sentence.

██ United States Sentencing Guidelines § 5K2.0 recognizes that under 18 U.S.C. § 3553(b) "the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b)). Family ties and responsibilities are normally "discouraged" grounds for departure, U.S.S.G. § 5H1.6, because they are not outside the normal "heartland" case which the Sentencing Commission has already taken into consideration. Nonetheless, such factors "*could* remove a case from the heartland, but only if they are present in a manner that is unusual or special, rather than 'ordinary.'" *United States v. Rivera*, 994 F.2d 942, 948 (1st Cir.1993) (emphasis in original). Thus, a sentencing court may depart downward for purposes of a defendant's family ties and responsibilities, if, and only if, it finds those factors to be unusual or special. *Id.* at 948, 951.

██ Ordinarily, a district court's refusal to exercise its discretion to depart downward from the sentencing guidelines is not reviewable on appeal. *United States v. LeBlanc*, 24 F.3d 340, 348 (1st Cir.1994); *United States v. Smith*, 14 F.3d 662, 665 (1st Cir.1994); *United States v. McAndrews*, 12 F.3d 273, 276 (1st Cir.1993). Appellate jurisdiction does attach, however, where the sentencing court's decision not to depart is based on the court's mistaken view that it lacks the legal authority to consider a departure. *LeBlanc*, 24 F.3d at 348; *Smith*, 14 F.3d at 665–66; *United States v. DiIorio*, 948 F.2d 1, 8 (1st Cir.1991). In other words, where the court errs in determining whether the allegedly special circumstances are of the "kind" that the Guidelines, in principle, permit the sentencing court to consider, we may proceed to review the courts sentencing decision not to depart. *Rivera*, 994 F.2d at 950–51. On the other hand, if "we find that the court properly understood its power to depart, but refused to exercise that power, we lack jurisdiction to consider the appeal." *LeBlanc*, 24 F.3d at 348; *United States v. Lombardi*, 5 F.3d 568, 571–72 (1st Cir.1993).

Thus, the issue on this appeal is whether the district court exercised its discretion by

finding that Romero's family circumstances, including his son's disease, was not sufficiently unusual or different from the heartland case to warrant a departure or whether the court found that the Guidelines did not allow him to depart for circumstances like the ones present in this case. Because we find the court did not misunderstand its authority to depart, its departure decision is not reviewable on appeal.

It is fairly clear that the court understood its ability to depart under the guidelines, but found that the facts of the case prevented the court from doing so. The court explicitly and correctly noted that it was considering a discouraged type of departure for unique family circumstances. The court then found that the facts of this case were not "so different from what I see in 90 percent of the cases." This demonstrates that the court knew that it could depart if it found the facts placed the present case outside of the heartland of cases that it normally faced.

The court did say: "Assuming no diseases, assuming no circumstances of that kind— that mere fact that a father, that of itself is extraordinary, but *that is not what the law allows me to consider.*" (emphasis added). In the context of the entire decision and the court's previous statements, we interpret this statement simply as a correct expression of the applicable law. The court was saying that it could not depart unless it found the facts of the case were unusual or different than the heartland case and that the mere fact that Romero was a father and had children that someone else was caring for did not constitute an unusual or special situation for which the Guidelines would allow a departure. After Romero's counsel pointed out that there was evidence of a special circumstance—namely Romero's son's blood disease—the court stated that it had assumed the son had either sickle-cell anemia or leukemia, "but that those two factors are not enough for me to depart." The court was not saying that the Guidelines prohibited him from considering Romero's son's disease as the type of factor upon which a departure decision can be based, he was merely saying that he considered the disease and that it was "not enough for [him] to depart." Although the court's language is not a model of

clarity, we are certain that the judge was making a factual and discretionary determination here; he did not hold that diseases can never merit a departure under the Guidelines. The court was thus not mistaken about its power to depart but rather made a judgment call that we may not review on appeal.

*Affirmed.*