USCA1 Opinion

 

 ____________________ No. 94-2303 UNITED STATES OF AMERICA, Appellee, v. ALEJANDRO COLLADO, Defendant, Appellant. ____________________ No. 95-1041 UNITED STATES OF AMERICA, Appellee, v. MIGUEL CRUZ-SORIANO, Defendant, Appellant. ____________________ No. 95-1080 UNITED STATES OF AMERICA, Appellee, v. MIGUEL BRITO, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Hector M. Laffitte, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Campbell, Senior Circuit Judge, ____________________ and Lynch, Circuit Judge. _____________ ____________________ Jeffrey E. Feiler, P.A. on consolidated brief for appellants. _______________________ Miguel Brito on supplemental brief pro se. ____________ Jose A. Quiles, Assistant United States Attorney, Senior _________________ Litigation Counsel, Guillermo Gil, United States Attorney, and Jacabed _____________ _______ Rodriguez Coss, Assistant United States Attorney on briefs for the ______________ United States. ____________________ February 1, 1996 ____________________ CAMPBELL, Senior Circuit Judge. This is a consolidated ____________________ appeal on behalf of three defendants who were aboard a vessel that was intercepted for narcotics trafficking in Puerto Rican waters. Following a four-day joint jury trial, Alejandro Collado, Miguel Cruz-Soriano, and Miguel Brito were found guilty of aiding and abetting the possession of cocaine with intent to distribute, in violation of 21 U.S.C. 841(a) and 18 U.S.C. 2.1 Each received a sentence of 235 months of imprisonment to be followed by five years of supervised release. On appeal they claim that the evidence was insufficient to sustain the jury verdict. In a supplemental brief filed pro se, defendant Brito asserts several other errors that allegedly infected the trial and his sentence. I. Background I. Background We summarize the relevant evidence in the light most favorable to the verdict. See United States v. DeMasi, ___ _____________ ______ 40 F.3d 1306, 1310 (1st Cir. 1994), cert. denied, 115 S. Ct. ____________ 947 (1995). In the early hours of January 27, 1994, the U.S. Customs Service Air Branch dispatched two aircraft to the southeast of St. John in the U.S. Virgin Islands after  ____________________ 1 A second count charging aiding and abetting the possession of cocaine with intent to distribute, on board a vessel of the United States and subject to its jurisdiction, in violation of 46 U.S.C. 1903(a)(1), (a)(2)(C), & (f) and 18 U.S.C. 2, was dismissed following the defendants' motion for judgment of acquittal pursuant to Fed.R.Crim.P. 29. -3- -3- learning that an air drop of contraband was to take place. The plane making an air drop was not found, but a vessel was detected in the suspected area, east of Puerto Rico, by a Customs NOMAD maritime surveillance and search aircraft equipped with a 360-degree radar ("Omaha 05"). Pilot Mark Jackson first observed the vessel from his window at approximately 3:33 a.m., aided by bright moonlight. He testified that the vessel was traveling without lights and quickly, leaving behind observable waves. The air interdiction officer who assisted him, Leslie Robb, immediately located the vessel using a forward looking infrared (FLIR) system. This equipment senses heat energy emitted by objects and produces black and white images which can be recorded on videotape, as was done here. Omaha 05 tracked the vessel for about forty-five minutes until it reached Cayo Luis Pena, an uninhabited key near the eastern coast of Puerto Rico. During this period the vessel occasionally stopped; Officer Robb testified that smugglers often use this tactic of going "dead in the water" (DIW) in order to listen for surveillance aircraft and avoid detection. Omaha 05 lost track of the vessel at least twice during this period. Contact resumed within a few minutes each time, according to the videotape and testimony by Robb. After the vessel reached Cayo Luis Pena, Officer Robb observed at least three people moving to and from the -4- -4- shore. The vessel departed seven to ten minutes later, at about 4:30 a.m. It traveled westward without lights at a gradually increasing speed. Omaha 05 tracked the vessel for about forty minutes and then lost contact at 5:09 a.m. for twelve minutes. Officer Robb explained at trial that he lost the target vessel when it went DIW and his attention was focused on the radar, instead of the FLIR (a manual tracking system), in order to direct a Customs marine unit to the target vessel. Robb temporarily was unable to detect any vessel in the area. He then located the Customs marine unit and a fuerzas unidas rapida accion (FURA) vessel of the _______ ______ ______ ______ Puerto Rican Police Department, and at 5:21 a.m. reacquired the target vessel on the FLIR. The vessel was less than one mile from the point where it was lost. Robb testified that no other vessels were detected in the area. Omaha 05, assisted by a FURA helicopter, guided the Customs marine unit to intercept the target vessel. Pedro Vicens, a special agent and criminal investigator on the Customs boat, testified that four individuals2 were aboard the twenty-four foot fishing boat which had two seventy-five horsepower engines. The vessel had two large gas tanks built into the area that customarily stores fishing equipment or bait. Approaching the vessel, Vicens sensed a strong odor of  ____________________ 2 Diogenes Arturo Marcelino, in whose name the boat was registered, entered a guilty plea before the trial of the three defendants-appellants. -5- -5- gasoline. He soon observed that the boat was full of fluid and gasoline: the fuel line had been cut, gas was coming from the tank, and individuals aboard appeared to be bailing out gasoline from the bottom of the vessel and moving as if to wash something. He testified that washing the deck to conceal any smell or residue of narcotics was a common practice of drug smugglers.  The four aboard were taken into custody and transported along with the vessel to the police station at Puerto Chico. Thereafter, Pilot Jackson and Officer Robb accompanied Customs Agents Vicens and Hector Marte (among others) by helicopter to Cayo Luis Pena, the uninhabited key at which Omaha 05 had observed the vessel stop approximately three hours earlier. There they searched the area where movement had been detected. They found nine bales containing 261 kilograms of cocaine, as a laboratory test confirmed. Upon return to the station at Puerto Chico, Marte photographed the vessel and retrieved fibers of plastic, red and yellow yarn, green fluorescent material, and plastic bubble wrapping. A forensic chemist compared these samples to ones taken from the wrapped bales found at Cayo Luis Pena and testified that they had the same chemical composition. Also found on the boat were life jackets, a knife, flare guns, spark plugs, and damp cloth.  -6- -6- At the close of the government's case, the defense moved for a judgment of acquittal on both counts pursuant to Fed.R.Crim.P. 29. The district court denied the motion as to count one and reserved ruling on the second count. The defense rested without presenting evidence and again moved for a judgment of acquittal. The following day the district court again denied the motion as to count one, and granted it as to count two. It instructed the jury on the charge of aiding and abetting the possession of cocaine with intent to distribute. A guilty verdict was returned against all defendants. II. Discussion II. Discussion Defendants challenge the sufficiency of the evidence to support their convictions. They claim that the government failed to show the shared criminal intent required for an aiding and abetting charge. They add that the temporary losses of tracking on the FLIR system and the weakness of the circumstantial evidence connecting them to drug trafficking warrant a reversal of their convictions.  In reviewing these claims, we consider the evidence in the record as a whole, including all reasonable inferences therefrom, in the light most favorable to the prosecution in order to ascertain whether a rational jury could have found defendants guilty beyond a reasonable doubt. See United ___ ______ -7- -7- States v. Romero, 32 F.3d 641, 645 (1st Cir. 1994). In so ______ ______ doing, we defer to the jury's determinations of credibility and respect its reasonable construction of the evidence. See ___ id. We note that "no premium is placed upon direct as __ opposed to circumstantial evidence," and that "'individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it.'" United States v. Ortiz, _____________ _____ 966 F.2d 707, 711 (1st Cir. 1992) (citations omitted), cert. _____ denied, 113 S. Ct. 1005 (1993). ______ Defendants contend that the government had to prove that they had a shared criminal intent and were not merely present at or aware of a criminal act. See Nye & Nissen v. ___ ____________ United States, 336 U.S. 613, 619 (1949) (a defendant who aids _____________ and abets must "in some sort associate himself with the venture, . . . participate in it as in something that he wishes to bring about") (citing United States v. Peoni, 100 _____________ _____ F.2d 401, 402 (2d Cir. 1938)); United States v. Francomano, _____________ __________ 554 F.2d 483, 486 (1st Cir. 1977) ("mere presence at the scene and knowledge that a crime was to be committed" is insufficient to show aiding and abetting) (citation omitted). They assert that no proof was offered on the relationship between them and the apparent captain (in whose name the boat was registered), between the four aboard and the three persons observed offloading at Cayo Luis Pena, or between the defendants themselves. Moreover, no connection to any plane -8- -8- making an air drop was ever established. Defendants add that upon interception of the vessel, they permitted Agent Vicens to board and cooperated fully. The record, considered as a whole, does not support defendants' argument. The knowledge element of a charge under  841(a) "can rarely be established with direct evidence." United States v. Gonzalez-Torres, 980 F.2d 788, 791 (1st Cir. _____________ _______________ 1992). Circumstantial evidence has been held to justify a finding of criminal intent on facts quite similar to the instant case: i.e., where only a few individuals are aboard a ____ small boat, large or extra gas tanks are in place (rather than more typical bait or fishing equipment), the vessel periodically runs without lights and goes DIW, an FLIR system tracks the vessel to the site where drugs are later found, traces of material used to wrap the cocaine are found on board, and a legitimate alternative purpose for the voyage appears lacking. See, e.g., United States v. Morales- ___ ____ ______________ ________ Cartagena, 987 F.2d 849, 852 (1st Cir. 1993); United States _________ _____________ v. Alvarado, 982 F.2d 659, 661-662 (1st Cir. 1992); United ________ ______ States v. Cuevas-Esquivel, 905 F.2d 510, 515 (1st Cir.), ______ _______________ cert. denied, 498 U.S. 877 (1990); United States v. Corpus, ____________ ______________ ______ 882 F.2d 546, 550 (1st Cir.), cert. denied, 493 U.S. 958 _____________ (1989) and 497 U.S. 1009 (1990). A jury could reasonably ___ infer from the evidence that each of the defendants possessed -9- -9- the requisite criminal intent and aided and abetted the accomplishment of the offense as charged.3 Defendants attempt to poke several other holes in the prosecution's case: 1) no plane making an air drop was found; 2) the intercepted vessel itself contained no contraband; 3) the residue particles found on board could have been tracked on by Agent Marte after he helped to collect the cocaine bales from Cayo Luis Pena, especially as he did not note the presence of any residue when he intercepted and boarded the vessel; 4) Agent Vicens did not document any cut fuel line or gasoline on deck in his report of the incident; 5) no description of the vessel is provided in the audio/videotape; 6) the vessel initially tracked was said to be traveling toward Fajardo on the east side of Puerto Rico, whereas Cayo Luis Pena is northward; and 7) the FLIR system lost the suspected vessel at least three times, including once for a twelve-minute period, after which the vessel was found within one mile of its previous location despite testimony as to its capacity for rapid travel.   ____________________ 3 As the government notes, defendants do not specifically challenge the sufficiency of the evidence relating to an intent to distribute. Proof beyond a reasonable doubt of knowing possession for the purpose of distribution is required for a charge under 841(a). See ___ United States v. Garcia, 983 F.2d 1160, 1164 (1st Cir. 1993). _____________ ______ To the extent that defendants' challenge was meant to incorporate this aspect of intent, our holding is unchanged. Their intent to distribute can reasonably be inferred from the large quantity of cocaine (261 kilograms), cf. id. at ___ ___ 1165, which was deposited on the uninhabited key. -10- -10- We again find the above argument unpersuasive when assessed in light of the record as a whole. With respect to the last three points alleging misidentification of their vessel, the jury was free to believe the testimony of Officer Robb, who operated the radar and FLIR system and detailed the process by which Omaha 05 tracked the vessel. The jury viewed much of the videotape, including the twelve-minute period when the Omaha 05 lost the vessel. Its apparent decision to credit Robb's testimony that no other non- governmental vessels were in the area at the time and that the same vessel was subsequently located is a plausible view of the evidence.  The jury also could have reasonably concluded that the vessel changed direction at some point in its voyage. The absence of contraband aboard is not fatal to the prosecution's case, given substantial evidence connecting the vessel to the cocaine (e.g., the videotape, the positive ____ match of wrapping samples, the departure of the vessel from Cayo Luis Pena without lights at an increasing speed, and the evidence of extra fluid on the vessel bottom and the crew members' washing motions). Cf. Cuevas-Esquivel, 905 F.2d at ___ _______________ 512, 515 (affirming conviction where no contraband was found aboard but a videotape showed a tarp being thrown from the ship and bales floating nearby); Corpus, 882 F.2d at 549-550 ______ (same, where bales were observed being thrown from the ship -11- -11- and floating nearby, no other vessel was shown to be in the area, and the vessel bottom appeared to have been recently washed). Nor do defendants' other contentions warrant disturbingthejury'sassessment oftheoverallevidence presented. It is well established that the government need not "disprove every reasonable hypothesis of innocence, provided that the record as a whole supports a conclusion of guilt beyond a reasonable doubt." Cuevas-Esquivel, 905 F.2d at _______________ 514; Gonzalez-Torres, 980 F.2d at 790. We find that _______________ sufficient evidence was presented to sustain the guilty verdicts here.4 The judgments of conviction are affirmed. ________  ____________________ 4 We have considered, in addition, the separate contentions made by defendant Brito in his brief. We find these contentions to be without merit.  -12- -12-