UNITED STATES of America, Appellee,

v.

Errol MAYNARD, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Glen PETERSEN, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Austin CAINES, Defendant, Appellant.

Nos. 88–1804 to 88–1806.

United States Court of Appeals,
First Circuit.

Heard July 31, 1989.

Decided Sept. 14, 1989.

Lydia Lizarribar–Masini (argued), by appointment of the Court, for appellant Errol Maynard.

Virginia Chosed, with whom Entin, Schwartz, Margules, and Lazarus, were on brief, for appellant Glen Petersen.

Eric M. Quetglas Jordan, San Juan, P.R., for appellant Austin Caines.

Antonio R. Bazan, Asst. U.S. Atty., Crim. Div., with whom Charles E. Fitzwilliam, Acting U.S. Atty., was on brief, for U.S.

Before BOWNES and SELYA, Circuit Judges, and HARRINGTON, U.S. District Judge, of the District of Massachusetts, sitting by designation.

BOWNES, Circuit Judge.

Defendants-appellants Errol Maynard, Glen Petersen, and Austin Caines, appeal their jury conviction of possession with intent to distribute marijuana, in violation of 46 U.S.C.App. § 1903(a), (c), and (f), on the grounds, *inter alia*, that their vessel was not subject to the jurisdiction of the United States when the Coast Guard boarded and searched it. We reverse the convictions for lack of jurisdiction.

## I. BACKGROUND

### A. *The Undisputed Facts*

On February 16, 1988, the United States Coast Guard Cutter Vashon was conducting a routine patrol along the south coast of Puerto Rico, when it sighted a 30 foot sailing vessel, the Carpe Diem, approximately 20 nautical miles south of Ponce, Puerto Rico. There is a conflict in the testimony about the flag the vessel was flying which we discuss in detail *infra*. The Vashon maneuvered alongside the sailboat and the commanding officer of the

Vashon, William L. Ross, indicated that he wanted to converse with the sailboat's occupants on the VHF marine radio. In the ensuing radio conversation, the master of the Carpe Diem, codefendant Errol Maynard, stated that they were sailing from Venezuela to Barbuda, but did not identify the port of departure. Ross requested Maynard's consent to board the sailing vessel. Maynard consented to the boarding, and complied with Ross' request to douse the sails and stop the vessel.

A four-man armed boarding party, commanded by Lieutenant Michael Emerson, was launched from the Vashon in a small boat, and it circled the Carpe Diem. Permission to board the Carpe Diem was verbally confirmed by Maynard. The boarding party observed three persons aboard the Carpe Diem, codefendants Errol Maynard, Glen Petersen, and Austin Caines. Upon boarding, the coast guard smelled marijuana, conducted a security sweep, in which each interior compartment was examined, and found bales of what appeared to be marijuana in the cabin. Two chemical field tests were conducted on the spot and the bales were tested positive for marijuana. The boarding party also found: other nations' flags inside the chart table and lockers; two radio licenses with United States Virgin Islands' registration numbers; a passport belonging to Maynard which indicated that he was a British citizen from the British Virgin Islands; and a driver's license belonging to Petersen

which indicated that he also was a citizen of the British Virgin Islands.

Emerson reported, via the radio, to Ross, who had remained on the Vashon, that because marijuana was present on the Carpe Diem and because no evidence of registration or documentation of nationality for the Carpe Diem had been found, he recommended that the Carpe Diem be considered a stateless vessel. Ross requested and received, via telephone and teletype circuits, from his operational commander in San Juan, who in turn had contacted the Commandant of the United States Coast Guard in Washington, D.C., a statement of no objection to declaring the Carpe Diem a stateless vessel and seizing it. Both Ross and Emerson testified at trial that to their knowledge, at no time was Great Britain or the British Virgin Islands asked for a statement of "no objection" to board the Carpe Diem; nor was there any evidence that anybody made such a request.[1] The three codefendants were then arrested and the Carpe Diem seized.

On February 24, 1988, the three codefendants were charged with a one count indictment of possession of approximately 660 kilograms of marijuana with intent to distribute, in violation of 46 U.S.C.App. § 1903(a), (c), and (f), and 18 U.S.C. § 2. The defendants entered a plea of not guilty, and on March 15, 1988, filed a motion for suppression of evidence, claiming

---

1. The cross-examination of Ross during the trial contained the following:

   MR. FUENTES (defense attorney): My question was that no consent was requested from the British government to board the Carpe Diem.
   MR. BAZAN (United States Attorney): Objection, Your Honor, that it has been assured that no consent was obtained, there is a certificate and there is a certificate stating that the State Department stated that this is a stateless vessel. That is the evidence.
   MR. FUENTES: No, Your Honor, but you see the answer tended to mislead.

   THE COURT: The answer was very clear, he [Ross] did not and there is no evidence before the court that anybody did.
   Trial transcript at 90–91.
   The cross-examination of Emerson during the trial contained the following:

   MR. FUENTES: The fact that I want established is that there was no attempt to get a permit from Britain to board the vessel.
   THE COURT: That has been established.
   MR. EMERSON: Yes
   Trial transcript at 134. (Emphasis added).

that the United States lacked jurisdiction to board and search the vessel. The motion was denied, and a two-day jury trial commenced on April 20, 1988. The defendants' motion for suppression of evidence was renewed and preserved during the trial. The defendants' Rule 29 motion for a judgment of acquittal, on the grounds that the Coast Guard had no jurisdiction at the time it boarded the Carpe Diem, was denied at the close of the government's case and again at the close of all the evidence.

During the trial, the defendants maintained that possession of the marijuana had been forced upon them by the people who had hired them to transport the Carpe Diem from Venezuela to Barbuda, and that at the time that they had agreed to transport the vessel they had no intention of possessing or distributing drugs. The defendants testified that a few hours after they had set sail, a speedboat carrying the people who had hired them, intercepted them and forced them at gunpoint to take the marijuana, and that they had intended to notify the authorities of what happened when they docked. It was the government's position that the defendants were intentionally possessing with intent to distribute the marijuana. Its case was based essentially on the following facts: that marijuana was found on board the Carpe Diem; that the vessel was 250 miles off course from its purported route; that the crew did not name a port of departure; that there was no registration or proper documentation on board; and that flags of nations other than the one the Carpe Diem was flying were found inside the cabin. A guilty verdict was returned by the jury on April 21, 1988.

The basis of defendants' jurisdictional appeals is that no effort was made to obtain a "no objection" statement from Great Britain, the claimed country of registry.

### B. *The Disputed Facts*

The testimony bearing on what flag the Carpe Diem was flying was as follows. Captain Ross testified that the name of the boat, Carpe Diem, was painted on the stern of the vessel, but did not show a home port or registration numbers, that prior to boarding, a courtesy flag was observed flying on the Carpe Diem, but that it was not identified as a British Virgin Islands' flag until after the Coast Guard boarded the Carpe Diem. The government's other witness, Lieutenant Emerson, the commander of the boarding party, also testified that the name Carpe Diem was painted on the stern, but, in contrast to Ross' testimony, Emerson testified that the flag that was flying on the Carpe Diem was identified as a British Virgin Islands' courtesy flag by the Coast Guard crew *before* they boarded the Carpe Diem. Emerson further testified that the Carpe Diem's captain, Maynard, had stated during the initial radio conversation, prior to boarding, that he was a citizen of the British Virgin Islands and that the nationality of the Carpe Diem was British. The 7th Coast Guard District Law Enforcement Checklist, prepared by Lieutenant Emerson after the interception of the Carpe Diem, corroborates Emerson's testimony of the events. A checklist is a document which is routinely prepared by the Coast Guard for use in future criminal trials.[2] It is a record of the substance and

**2.** The Checklist is prefaced with the following statement:

ACCURACY.
1. Expect that this LAW ENFORCEMENT CHECKLIST could be made available to opposing parties at any trial or administrative

proceeding and be critically examined. Sloppy, inaccurate, or inconsistent information has the potential to weaken any government case. Care must be taken to insure that the information is recorded neatly and accurately.

time of the events arising from Coast Guard interceptions of vessels at sea. The checklist specifically stated: that the British Virgin Islands' flag was observed five minutes after the Carpe Diem was first sighted by the Vashon; that during the initial radio contact with the Carpe Diem, before the boarding, Maynard had stated to Captain Ross that his nationality was British; that the vessel was registered under the British flag; and that a British Virgin Islands' flag was on board.[3]

It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States, or who is a citizen of the United States or a resident alien of the United States on board any vessel, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

\*    \*    \*    \*    \*    \*

## II.  JURISDICTION

### A.  *The Statute*

46 U.S.C.App. § 1903, is the amended and recodified version, effective November 10, 1986, of 21 U.S.C. § 955a. It deals with the issue of which vessels are subject to the jurisdiction of the United States. The relevant parts of the statute are the following:

**(a) Vessels of United States or vessels subject to jurisdiction of United States**

**(c) "Vessel subject to the jurisdiction of the United States" and "vessel without nationality" defined;  claim of nationality or registry**

(1) For purposes of this section, a "vessel subject to the jurisdiction of the United States" includes:

(A) a vessel without nationality;

(B) a vessel assimilated to a vessel without nationality, in accordance with paragraph (2) of article 6 of the 1958 Convention on the High Seas;

**3.**  Relevant Portions of the Coast Guard Checklist are the following:
    3.  Time of Initial Acquisition of Vessel: 1715Q.
    7.  Visual Acquisition of Vessel:
        Time   Data
        1720   Name on Vessel's Hull: Carpe Diem
        1720   Flag Flown: BVI [British Virgin Islands]
    8.  Communications with Vessel:
        a.  Time of Initial Communications: 1720
            Means of Communications: Radio
        e.  Questions for all vessels:
                Time and date of questioning:
                1720Q 16 Feb 88
                Name of questioner: Lt. Ross
                Names of other persons present during the questioning: Lt. Emerson
            (1) Name of person with whom talking?  unk
            (2) Nationality of the person with whom talking?: British
            (5) Under what flag is the vessel registered?: British
            (7) Do you have a flag on board?: BVI
    Time when communicated the order/request [to heave to]: 1730Q
    Time when small boat launched with boarding party: 1745

(C) a vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of United States law by the United States;

(D) a vessel located within the customs waters of the United States; and

(E) a vessel located in the territorial waters of another nation, where the nation consents to the enforcement of United States law by the United States.

.    .    .    .    .

(2) For purposes of this section, a "vessel without nationality" includes:

(A) a vessel aboard which the master or person in charge makes a claim of registry, which claim is denied by the flag nation whose registry is claimed; and

(B) any vessel aboard which the master or person in charge fails, upon request of an officer of the United States empowered to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel.

A claim of registry under subparagraph (A) may be verified or denied by radio, telephone, or similar oral or electronic means. The denial of such claim of registry by the claimed flag nation may be proved by certification of the Secretary of State or the Secretary's designee.

(3) For purposes of this section, a claim of nationality or registry only includes:

(A) possession on board the vessel and production of documents evidencing the vessel's nationality in accordance with article 5 of the 1958 Convention on the High Seas;

(B) flying its flag nation's ensign or flag; or

(C) a verbal claim of nationality or registry by the master or person in charge of the vessel.

### B. *A Stateless Vessel*

■ The government's position is that the Carpe Diem was a stateless vessel, "a vessel without nationality," and was, therefore, subject to the jurisdiction of the United States. § 1903(c)(1)(A). The requirement of being a stateless vessel can be satisfied in one of two ways: First, a vessel is without nationality if it is "a vessel aboard which the master or person in charge makes a claim of registry, which claim is denied by the flag nation." § 1903(c)(2)(A). In the alternative, a vessel is without nationality if the master in charge "fails, upon request of an officer of the United States ... to make a claim of nationality...." § 1903(c)(2)(B).

### 1. Claim of Nationality

Under the first prong, a vessel is a stateless vessel, subject to the jurisdiction of the United States, only if a claim of nationality or registry is made. Such a claim includes "possession on board the vessel and production of documents evidencing the vessel's nationality," "flying its flag nation's ensign or flag," *or* "a verbal claim of nationality or registry by the master." § 1903(c)(3)(A), (B), and (C). At least one, and probably two, of the three alternative ways of claiming nationality have been shown to have occurred in this case. It does not matter that the third alternative of showing a claim of nationality, i.e. possession on board the vessel and production

of documents evidencing the vessel's nationality, was not made. The statute requires only *one* of the three alternative methods of claiming nationality. *See United States v. Potes*, 880 F.2d 1475, 1479 (1st Cir.1989).

In analyzing these claims of nationality, we first note that the Carpe Diem was flying a British Virgin Islands' flag. The Coast Guard's own official checklist documented that the British Virgin Islands' flag was observed five minutes after the Carpe Diem was first sighted by the Vashon, prior to boarding the Carpe Diem. And, Lieutenant Emerson, commander of the Coast Guard boarding party, testified at trial that the Carpe Diem was flying a flag which was identified as a British Virgin Islands' courtesy flag by the Coast Guard crew before they boarded the Carpe Diem.

While Captain Ross' testimony partially contradicted the above evidence, we do not find that his testimony, even if believed, helps the government's case. Ross testified that a flag was, in fact, observed flying on the Carpe Diem before boarding, but that it was not identified as a British Virgin Islands' flag until after boarding. It seems inescapable that the flag identified on boarding was the same one that was flying prior to the boarding. There is no evidence to suggest or hint of a change of flags between sighting the Carpe Diem and boarding her. Moreover the small boat containing the Coast Guard boarding party circled the Carpe Diem within close range before boarding. It would certainly have been possible to make an identification of the observed flag prior to boarding, if Captain Ross had so ordered. There is nothing in the record which indicates that any such procedure was ordered. The statute requires that the vessel be "flying its flag nation's ... flag." § 1903(c)(3)(B). It makes no qualifications for the Coast Guard's inability to identify the flag, whether because of visibility problems, weather, darkness, size, or unfamiliarity. Thus, even if Ross' testimony is credited, and Emerson's testimony and the Coast Guard checklist are discounted, the requirement under the statute for a claim of nationality, i.e. flying the flag nation's flag, was met.

In addition, it reasonably could be found that the Carpe Diem satisfied its claim of nationality by another independent criterion as well: "a verbal claim of nationality or registry by the master." § 1903(c)(3)(C). The Coast Guard's chronological checklist shows that during the initial radio contact between the Vashon and the Carpe Diem, before any boarding, Maynard had stated to Captain Ross that his nationality was British, that the Carpe Diem was registered under the British flag, and that a British Virgin Islands' flag was on board. Lieutenant Emerson corroborated this account, testifying at trial that he was present with Captain Ross during the initial radio conversation, and that Maynard had stated that he was a citizen of the British Virgin Islands and that the nationality of the Carpe Diem was British. Captain Ross, however, testified that no such conversation occurred prior to boarding. If Emerson's testimony and the Coast Guard checklist are credited, then the Carpe Diem satisfied its burden of claiming a nationality by this criterion as well. If Ross' testimony is believed, and no claim of nationality was made, then the government cannot claim that the Carpe Diem was a stateless vessel under the statute's first prong, i.e., that a vessel is stateless *if* the master makes a claim of nationality which is denied by the flag nation. § 1903(c)(2)(A). Nor can the government, under these circumstances, satisfy the statute's alternative prong of proving statelessness: that a vessel will be considered stateless if the master "fails, upon request of an officer of the United States ... to make a claim of nationality or registry." § 1903(c)(2)(B).

The government has not argued, nor is there any evidence on the record, that Maynard *"failed"* to claim a nationality *"upon request"* of the Coast Guard. Thus, if a nationality claim was not made or denied during the initial radio conversation, and no subsequent request was made and denied prior to boarding, under the statute the vessel was not stateless prior to boarding.

Proper procedure would have been for the Coast Guard to request a claim of nationality in its initial radio conversation with the Carpe Diem. Even if technical problems with the radio transmission developed during this conversation, as Ross testified, that did not preclude such a request. The government's own case included uncontradicted evidence that Lieutenant Emerson, who was in the small boat that was carrying the Coast Guard boarding party, *spoke* with Maynard *prior* to boarding the Carpe Diem to corroborate that they had permission to board. If it is true, as Ross testified, that there had been no prior discussion on the issue of nationality over the radio, the proper procedure would have been to request a statement of nationality from Maynard at the time that Emerson was in the small boat and in verbal contact with Maynard prior to the actual boarding. Thus, if Ross' testimony is believed, the government has not satisfied either of the two requirements in the statute for establishing statelessness. § 1903(c)(2)(A) and (B).

We also note that, despite Ross' testimony, the government in its brief concedes that Maynard made a claim of British nationality during the initial radio conversation prior to boarding: *"Although there was an initial claim of British registry on the radio* and the boat was flying a small faded courtesy or yachting flag of the British Virgin Island, it is also a fact that there were two valid radio licenses issued by the FCC which contained United States Virgin Island registration numbers." Brief for the Government at 30.

To sum up, the statute's requirement of a "claim of nationality" was met by the Carpe Diem, because at least one, and probably two, of the three alternative ways of making such a claim did occur.

### 2. Denial of Nationality

Since a "claim of nationality" was made, the Carpe Diem can be classified as a stateless vessel only if the "claim is denied by the flag nation whose registry is claimed." § 1903(c)(2)(A). In *United States v. Potes*, 880 F.2d 1475, 1479 (1st Cir.1989), we held that when a claim of Honduran nationality was verbally made by the vessel's master, but no Honduran flag was flying and the master could not produce the Honduran registration numbers, there was not sufficient proof to conclude that the vessel was without nationality because there was no evidence that the claim of Honduran nationality was ever denied by Honduras, and, therefore, the convictions had to be reversed.

In the instant case, it is undisputed that Great Britain was never asked to verify or deny Maynard's claim that the Carpe Diem was a British Virgin Islands' vessel. A statement by the Commandant of the United States Coast Guard in Washington, D.C. of "no objection" to declaring the Carpe Diem a stateless vessel and seizing it, is not sufficient. The statute explicitly states that the flag nation must deny the claim of nationalitity. Moreover, it is uncontroverted that the Coast Guard did not follow sound procedure by ascertaining if the Carpe Diem was subject to United States' jurisdiction before boarding it.

■ The facts are clear: a claim of nationality was made by the Carpe Diem by the act of flying a British Virgin Islands' courtesy flag; there was probably also a verbal claim of British nationality by the master of the Carpe Diem; this nationality claim was not denied by the flag nation, Great Britain, because it was not contacted

prior to boarding. We hold under these facts that, as a matter of law, the Carpe Diem was not a stateless vessel under 46 U.S.C.App. § 1903(c)(2)(3) subject to the jurisdiction of the United States at the time that the Coast Guard boarded it on the high seas.[4]

## C. *Grounds Other than Statelessness*

The alternative grounds to being a stateless vessel upon which United States jurisdiction can be based under the statute are not relevant to the instant case: a vessel assimilated to a vessel without nationality; a vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of United States law; a vessel located within the customs waters of the United States; or a vessel located in the territorial waters of another nation, where the nation consents to enforcement of United States law. § 1903(c)(1)(B), (C), (D), and (E). The government did not, at trial or on appeal, base its claim of jurisdiction on any of these grounds. It has argued only that the Carpe Diem was a stateless vessel and, therefore, that the United States had jurisdiction.

## D. *Consensual Boarding*

■ The government next argues that it had jurisdiction to board and search the

Carpe Diem because Maynard gave his consent to the boarding. In this case, the existence of consent to board or search is immaterial; what matters is that defendants—assuming they could do so—never waived their rights to challenge the jurisdiction of the United States to prosecute them for their conduct on the high seas. Jurisdiction is an element of the crime under which the defendants were charged. The government must prove that it had jurisdiction. It has failed to do so.

## E. *Standing to Challenge Jurisdiction*

■ The government's final argument is that the defendants have no standing to challenge the jurisdiction of the United States in this case. The government relies on the section of the statute which states:

**(d) Claim of failure to comply with international law; jurisdiction of the court**

A claim of failure to comply with international law in the enforcement of this chapter may be invoked solely by a foreign nation, and a failure to comply with international law shall not divest a court of jurisdiction or otherwise constitute a defense to any proceeding under this chapter.

46 U.S.C.App. § 1903(d). This section of the statute, however, does not support the government's position. The defendants are

---

**4.** We also note that the district court, after denying the Rule 29 motion, did not specifically instruct the jury that in order to convict the defendants it had to find that the vessel was subject to the jurisdiction of the United States. This is an essential element of the offense and required findings of fact as to whether or not the Carpe Diem was a stateless vessel. *See United States v. Potes,* 880 F.2d at 1478 n. 1 ("Because [the] jurisdictional requirement was an element of the offense [under 46 U.S.C. § 1903], and because it depended upon factual as well as legal determinations, it was for the jury to decide whether it had been satisfied."); *United States v. Canales,* 744 F.2d 413, 434 (5th Cir.1984) ("[T]he trial court may under *no* circumstances withdraw any element of an offense

from the jury's consideration in a criminal case ..."); *United States v. Ayarza–Garcia,* 819 F.2d 1043, 1048–49 (11th Cir.) (under 21 U.S.C. § 955a(a), the jurisdictional requirement is also a material element of the crime, and upon denial of defendants' Rule 29 motions, is a question for the jury), *cert. denied,* 484 U.S. 969, 108 S.Ct. 465, 98 L.Ed.2d 404 (1987). As we stated in *United States v. Potes,* 880 F.2d at 1478 n. 1: "[F]ailure to instruct the jury on an element of the crime may be so clear an error as to require a new trial despite the lack of a timely objection." We need not, however, decide whether this failure was plain error in the instant case, because we have concluded that the evidence was not sufficient to prove that the Carpe Diem was a stateless vessel.

not claiming that the Coast Guard failed to comply with "international law;" rather, they are claiming that the Coast Guard failed to comply with "United States" law. The government's references to the Convention of the High Seas, Art. 6 and 22, 13 U.S.T. 2312, T.I.A.S. No. 5200 (entered into force September 30, 1962), in which, under international law, a ship flying a flag of a recognized nation is generally immune from all interference on international waters by ships of any other nation, unless there is a treaty between the nations, is beside the point. The defendants have not invoked the "Convention of the High Seas," or any other international law, as the basis for their jurisdictional challenge. It is certainly true that under the United States statute, 46 U.S.C.App. § 1903(d), only Great Britain would have standing to challenge the United States for having violated international law, e.g. the "Convention of the High Seas." But the defendants are not making such a challenge. They are basing their challenge on violations of the requirements for jurisdiction to board vessels on the high seas as stated in the United States statute itself. We hold that the defendants have standing to challenge the jurisdiction of the United States on the grounds that it violated its own statute and that section (d) of the statute does not preclude such a challenge.

In a recent opinion, the 11th Circuit has also so held. *United States v. Mena*, 863 F.2d 1522 (11th Cir.1989), involved a similar governmental challenge to the defendants' standing to object to the United States exercise of jurisdiction over a vessel in international waters. The court concluded that the defendants were "not complain[ing] of a violation of international law," but rather that they were "assert[ing] that no competent evidence showed compliance with the domestic-law

requirement found in 46 U.S.C.App. § 1903(a) that their vessel be 'subject to the jurisdiction of the United States.' " *Id.* at 1530. The court went on to state that "had Congress intended to deprive defendants of standing to object to the government's non-compliance with the terms of section 1903(a), Congress would not merely have prevented defendants from raising objections under 'international law.' " *Id.* at 1531.[5]

### III. CONCLUSION

We hold that the Carpe Diem was not a vessel without nationality, as defined in 46 U.S.C.App. § 1903, and, therefore, defendants' conduct was not subject to the jurisdiction of the United States.

The convictions of the defendants are reversed.

---

**5.** Given our holding that the Carpe Diem was not subject to the jurisdiction of the United States, we need not address the other issues that the codefendants have raised on appeal, i.e. whether the district court erred in its jury instructions, and whether there was sufficient evidence for a finding that the necessary criminal intent for the offense existed.