Not for publication in West's Federal Reporter

# United States Court of Appeals
## For the First Circuit

Nos. 14-1584
       14-1605

UNITED STATES OF AMERICA,

Appellee,

v.

ALEJANDRO MARTINEZ AND PAULO ROSARIO,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Barron and Stahl, Circuit Judges,
and Sorokin,* District Judge.

Merritt Schnipper for appellant Martinez.
Paul M. Glickman, with whom Glickman Turley LLP was on brief, for appellant Rosario.
David M. Lieberman, Attorney, Criminal Division, Appellate Section, U.S. Department of Justice, with whom Rosa Emilia Rodriguez-Velez, United States Attorney, Nelson J. Perez-Sosa, Appellate Chief, Leslie R. Caldwell, Assistant Attorney General, and Sung-Hee Sue, Deputy Assistant Attorney General, were on brief, for appellee.

March 15, 2016

* Of the District of Massachusetts, sitting by designation.

**PER CURIAM**.  Alejandro Martinez and Paulo Rosario were traveling on a small vessel in the strait between the Dominican Republic and Puerto Rico when a United States Coast Guard ("USCG") patrol plane spotted them jettisoning into the sea what was later determined to be bales of cocaine.  Shortly thereafter, Martinez and Rosario were apprehended and brought to Puerto Rico, where they stood trial together on drug conspiracy charges.  Both men now appeal from their convictions.  After careful review, we AFFIRM.

## I. Facts and Background

A.   The Ill-Fated Voyage

In the early evening hours of August 16, 2012, a USCG patrol aircraft was operating above the Mona Passage, a roughly eighty-mile stretch of Atlantic Ocean between the Dominican Republic and Puerto Rico.  The crew spotted what appeared to be a small fishing vessel, or "yola," heading in the direction of Puerto Rico.  As the aircraft approached, two men aboard the yola were seen throwing four white bales overboard, before changing course and heading back toward the Dominican Republic.  Summoning a USCG cutter, the flight crew maintained visual contact with the yola. At approximately the same time, a Customs and Border Patrol boat was dispatched to retrieve the bales that had been thrown overboard.  The bales were recovered and were found to contain a total of some sixty-seven kilograms of cocaine.

In short order, the USCG cutter arrived and intercepted the yola. USCG personnel boarded the yola and questioned its two occupants, Martinez and Rosario, one of whom (it is not clear which) indicated that he was in the process of registering the yola in the Dominican Republic. Aside from the name "Alicantino" painted on the hull, however, the yola had no visible markings, did not carry a national flag, and there was no other evidence of registry onboard.

In response to an inquiry by the USCG, authorities in the Dominican Republic indicated that they had no record of the yola. As a result, in accordance with the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. § 70501 et seq., the USCG concluded that the yola was "a vessel without nationality" and was therefore subject to the jurisdiction of the United States. See 46 U.S.C. §§ 70502(c)(1)(A) and (d)(1)(C). Accordingly, Martinez and Rosario were taken into custody, transported to Puerto Rico, and turned over to the Drug Enforcement Agency ("DEA"). Several days later, in an interview with DEA Agent Jose Torres, Rosario waived his Miranda rights and confessed, implicating both himself and Martinez in a conspiracy to smuggle cocaine from the Dominican Republic to Puerto Rico.

B.    Indictment and Trial

Martinez and Rosario were both indicted on one count of conspiracy to possess with intent to distribute five kilograms or

more of cocaine on board a vessel subject to the jurisdiction of the United States, in violation of the MDLEA, and one count of conspiracy to import five kilograms or more of cocaine into the United States, in violation of 21 U.S.C. §§ 952, 960, and 963. On a motion in limine filed by the government, the district court found that MDLEA jurisdiction existed because the yola was, in fact, a vessel without nationality subject to United States jurisdiction.[1]

The case proceeded to trial. Over Martinez's objection (and his request for a severance), the jury heard testimony from DEA Agent Torres, who described Rosario's confession, albeit without directly stating that the confession also implicated Martinez. The jury returned guilty verdicts as to the defendants on both counts of the indictment. Subsequently, Rosario was sentenced to concurrent 210-month sentences on each of the two counts.[2] Martinez, who had sustained a prior felony drug conviction and was subject to a twenty-year mandatory minimum,

---

[1] MDLEA jurisdiction "in this context refers to the enforcement reach of the statute - not federal court subject-matter jurisdiction, which extends to any federal felony." See United States v. Matos-Luchi, 627 F.3d 1, 4 n.4 (1st Cir. 2010). While Rosario and Martinez both challenge the finding of MDLEA jurisdiction, there is no dispute that the district court had jurisdiction to hear the second count of the indictment, conspiracy to import five kilograms or more of cocaine.

[2] These sentences were later reduced to 168 months as a result of a motion filed pursuant to 18 U.S.C. § 3582(c)(2).

received concurrent 262-month sentences.

Martinez and Rosario both appeal their convictions, but on different grounds. Because the bases of the appeals vary, we consider each separately.

## II. Rosario's Appeal

As indicated, the district court found that jurisdiction existed under the MDLEA because the court concluded that the yola was properly deemed a vessel without nationality. Rosario's appeal is devoted solely to challenging this finding. Our review of the district court's finding of MDLEA jurisdiction is de novo. United States v. Mitchell-Hunter, 663 F.3d 45, 49 (1st Cir. 2011).

A.    The MDLEA

The MDLEA makes it unlawful to "knowingly or intentionally . . . possess with intent to . . . distribute[] a controlled substance on board . . . a vessel subject to the jurisdiction of the United States." 46 U.S.C. § 70503(a)(1). This prohibition "applies even though the act is committed outside the territorial jurisdiction of the United States." Id. at § 70503(b).

In relevant part, the term "vessel subject to the jurisdiction of the United States" is defined to include "a vessel without nationality." Id. at § 70502(c)(1)(A). A "vessel without nationality," in turn, includes one "aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and

- 5 -

unequivocally assert that the vessel is of its nationality."  Id. at § 70502(d)(1)(C).  Of importance here, the MDLEA provides that "[t]he response of a foreign nation to a claim of registry . . . is proved conclusively by certification by the Secretary of State or the Secretary's designee."  Id. at § 70502(d)(2).

B.    The District Court's Finding of MDLEA Jurisdiction

As we have described, when USCG personnel boarded the yola and questioned Martinez and Rosario, one of them made a claim of Dominican registry by stating that he was in the process of registering the yola in the Dominican Republic.  See id. at § 70502(e)(3) (defining a "claim of nationality or registry" to include "a verbal claim of nationality or registry by the master or individual in charge of the vessel").  This claim of registry triggered an obligation on the part of the USCG to contact the Dominican authorities with a request that they confirm or deny the yola's registry.  Id. at § 70502.  As evidenced by documentation prepared by the USCG at the time of the interdiction, the record suggests that the USCG queried the Dominican authorities regarding the registry of the "Alicantino," as was painted on the yola's hull.  The Dominican authorities responded, however, by indicating that they had no record of a vessel by the name of the "Alcantino," seemingly a misspelling of "Alicantino."

Prior to trial, the government filed a motion in limine seeking to establish MDLEA jurisdiction.  See id. at § 70504(a)

- 6 -

("Jurisdictional issues . . . are preliminary questions of law to be determined solely by the trial judge."). Accompanying the government's motion was a certification authored by Commander Salvatore Fazio of the USCG, in his capacity as the designee of the Secretary of State. In relevant part, the certification stated:

> On or about August 17, 2012, United States law enforcement personnel detected a yola vessel approximately 32 nautical miles southwest of Cabo Rojo, Puerto Rico . . . . United States law enforcement personnel conducted a right-of-visit boarding of the vessel. Upon inquiry, one of the two individuals on board identified himself as the master of the vessel, and claimed Dominican nationality for the yola. . . . [The USCG] requested that the Government of the Dominican Republic confirm or deny the vessel's registry. The . . . Dominican Republic responded that it could neither confirm nor deny the claim that the vessel was registered in the Dominican Republic.

In a short order issued prior to trial, the district court found MDLEA jurisdiction, reasoning that "Commander Fazio is the Secretary of State's designee and . . . his certification conclusively proves that the vessel in question is a vessel without nationality as the Dominican authorities did not affirmatively and unequivocally assert that the vessel is of Dominican nationality."

Later, after trial, Martinez and Rosario filed a joint motion for acquittal and dismissal, arguing that the district court had erred in finding MDLEA jurisdiction. The district court denied this motion in a lengthy written order. See United States v.

- 7 -

Rosario, 17 F. Supp. 3d 144 (D.P.R. 2014).

 C.  Rosario's Challenges to MDLEA Jurisdiction

Rosario raises three arguments contending that the district court erred in finding MDLEA jurisdiction. First, he argues that the USCG did not follow MDLEA protocol, as evidenced by the fact that the Dominican authorities responded with a misspelled version of the yola's name. Second, he contends that the USCG certification was inadequately detailed. Finally, he argues that the district court made a series of factual and procedural blunders in finding MDLEA jurisdiction. We find, however, that none of these arguments merits reversal.

 i.  Alcantino v. Alicantino

The record appears to indicate that the USCG contacted the Dominican authorities with a request that it verify the nationality of the "Alicantino," as was painted on the yola's hull. The Dominican authorities responded, however, with an indication that they had no record of the "Alcantino." Rosario challenges the district court's finding of MDLEA jurisdiction based on this discrepancy, but we conclude, based on the terms of the MDLEA, that he does not have standing to raise such a challenge. In relevant part, the MDLEA provides:

> A person charged with violating [the MDLEA] . . . does not have standing to raise a claim of failure to comply with international law as a basis for a defense. A claim of failure to comply with international law in the enforcement of this

chapter may be made only by a foreign nation.

46 U.S.C. § 70505; see also Mitchell-Hunter, 663 F.3d at 51 ("[T]he purpose of the MDLEA's jurisdictional requirement is not to protect a defendant's rights, but instead to maintain comity between foreign nations . . . .").

As Rosario points out, our cases distinguish between claims of a failure to comply with international law (as that term is contemplated in the MDLEA), which a defendant may not raise, and claims of a failure to comply with United States law, which a defendant may raise. For example, in United States v. Maynard, 888 F.2d 918 (1st Cir. 1989), we held that the defendant had standing to challenge the district court's finding of MDLEA jurisdiction based on the fact that the USCG had failed to contact British Virgin Islands ("BVI") authorities before seizing his vessel, even though he was flying a BVI flag and had likely made a verbal claim of BVI nationality. Id. at 925-27. We reasoned that the defendant could bring such a challenge because he sought to prove that the USCG failed to comply with the MDLEA, a United States statute, by not making contact with the BVI authorities. Id. at 927. In contrast, in United States v. Cardales-Luna, 632 F.3d 731 (1st Cir. 2011), we held that a defendant could not argue that a USCG certification was insufficient to confer MDLEA jurisdiction merely because it omitted certain details about the process by which the USCG contacted Bolivian authorities following

- 9 -

the defendant's claim of nationality.  Id. at 737.  We reasoned that the MDLEA does not permit a defendant to "look behind the State Department's certification to challenge its representations and factual underpinnings."  Id. (quoting United States v. Guerrero, 114 F.3d 332, 341 (1st Cir. 1997)).

Mindful of this distinction between challenges based on "international" and "domestic" law, Rosario attempts to portray his appeal as one rooted in the USCG's failure to comply with the substantive provisions of the MDLEA.  But, as we have said, the record strongly suggests that the USCG made the proper inquiry and, indeed, there is no evidence to the contrary. Rosario claims, however, that "[t]he Dominican Republic had no chance to deny the registry . . . because its response [seemingly] concerned a different vessel."  In other words, Rosario himself appears to attribute whatever error or miscommunication occurred not to the USCG, but to the Dominican authorities.  Rosario's claim fails, therefore, because it is plainly an effort to "look behind" the USCG certification and to challenge its factual underpinnings, see Cardales-Luna, 632 F.3d at 737, an effort that the MDLEA does not give him standing to undertake.  See 46 U.S.C. § 70505; Mitchell-Hunter, 663 F.3d at 51.

ii.  Insufficient Detail

Rosario next contends that, as a matter of law, State Department certifications must meet a "baseline level of

- 10 -

specificity" by including, for example, the "name or other identifying characteristics" of the vessel in question. Rosario argues that the certification at issue in this case was insufficiently specific because it referred only to a "yola vessel approximately 32 nautical miles southwest of . . . Puerto Rico" and did not provide additional identifying details.

We need not reach Rosario's broader claim because we conclude that, within the confines of this case, his argument is without merit. The record establishes that the yola was a small (approximately twenty-one-foot) and primitive vessel[3] powered by a single outboard motor. Aside from the name "Alicantino" painted on the hull, the yola had no visible markings. It did not display a registration number, a hailing port, or a national flag. What is more, when USCG crews boarded the yola, they were unable to locate registration paperwork or any other documentation that they could use to confirm the identity of the vessel or its passengers.

True, as Rosario points out, the USCG certification did not identify the name of the yola as the Alicantino. But, given the lack of any further identifying information on the vessel, the USCG certification was not defective based on its purported lack

---

[3] To illustrate the point, when the USCG cutter reached the yola, its engine had died and Martinez and Rosario were attempting to bail water using a bucket. The cutter attempted to tow the yola to port, but it promptly took on water and sank.

of specificity.[4]

### iii. Factual and Procedural Errors

Finally, Rosario urges reversal on grounds that the district court committed a series of factual and procedural errors in finding MDLEA jurisdiction. This claim is rooted in statements made by the district court during a hearing conducted during the trial (outside the presence of the jury), as well as a written statement contained in the district court's post-trial order denying the defendants' motion for acquittal and dismissal.

We begin with the hearing, which opened with the government moving to introduce into evidence the USCG certification. A series of objections by the defendants followed. In the course of a lengthy ensuing discussion between counsel and the district court, the court made statements suggesting it believed that: (1) evidence of the defendants' jettisoning of the cocaine was admissible based on the plain view exception to the Fourth Amendment; (2) the USCG had a right to seize the yola based on its presence in the so-called contiguous zone;[5] and (3) the

_____

[4] Again limiting our inquiry to these facts, we find no merit to Rosario's claim that an unspecific certification violates due process by posing a risk that one vessel might be mistaken for another. Rosario does not dispute that he was aboard the yola described in the USCG certification, and there were no other vessels anywhere near the yola at the time it was intercepted.

[5] The contiguous zone extends twenty-four miles from the coastline of the United States, including Puerto Rico. See 64 Fed. Reg. 48,701 (Sept. 2, 1999).

strength of the evidence was such that the defendants' guilt was a "slam dunk." Rosario contends that these statements were simply incorrect, evinced procedural misunderstandings by the district court, and effectively relieved the government of its burden to prove MDLEA jurisdiction. See United States v. Matos-Luchi, 627 F.3d 1, 5 (1st Cir. 2010) (holding that the government must establish MDLEA jurisdiction by a preponderance of the evidence).

We have carefully reviewed the hearing transcript, and while the district court and counsel often ranged far afield in the course of their discussion, we find no reason to disturb the district court's finding of MDLEA jurisdiction. Most importantly, as we have described, the district court had already determined, prior to trial, that MDLEA jurisdiction existed by virtue of the yola's status as a vessel without nationality. We thus find no merit to Rosario's claim that the district court's purported misstatements during the hearing, which occurred more than a week later, contributed to an erroneous finding of MDLEA jurisdiction.

Rosario also directs our attention to the district court's post-trial written order denying the defendants' motion for acquittal and dismissal, in which the district court wrote:

> Defendant Rosario alleges that "[f]or the United States to have jurisdiction over a vessel in the high seas, and over the occupants, the government must prove that the vessel is a vessel without nationality." The court disagrees, as jurisdiction is not an element of 21 U.S.C. §§ 952, 960, 963.

- 13 -

Rosario, 17 F. Supp. 3d at 152 (citations omitted). Rosario urges us to find that the district court's "disagree[ment]" with his statement is further evidence that the district court relieved the government of its burden to establish MDLEA jurisdiction.

We reject this argument because the district court's statement was, in fact, legally correct. The district court based its disagreement on the fact that MDLEA jurisdiction is not an element of 21 U.S.C. §§ 952, 960, and 963. These are the statutory provisions under which the defendants were charged in count two of the indictment, charging conspiracy to import five kilograms or more of cocaine, not in the MDLEA count. Thus, the district court's statement was correct because it is true that MDLEA jurisdiction is not an element of that offense. Thus, while the district court's statement was arguably confusing, we do not view it as an indication that the district court improperly relieved the government of its burden to prove MDLEA jurisdiction on the count that required it.[6]

For all of these reasons, we reject Rosario's challenges

---

[6] A later passage in the district court's opinion states that "the USCG complied with due diligence at the time of the interdiction . . . ." Rosario, 17 F. Supp. 3d at 152. This statement immediately followed a citation to Matos-Luchi, where we first held that the government bears the burden of proving MDLEA jurisdiction by a preponderance of the evidence. We view this as an indication that the district court properly construed the jurisdictional burden as falling on the government.

- 14 -

to the district court's finding of MDLEA jurisdiction.

### III. Martinez's Appeal

We turn next to Martinez, who raises a separate set of issues. We begin with his jurisdictional argument that the USCG certification contained inadmissible hearsay, then we consider his arguments related to the district court's admission of Rosario's confession and concomitant refusal to sever their joint trial.[7]

A.  Hearsay

Like Rosario, Martinez challenges the district court's finding of MDLEA jurisdiction. His argument may be summarized as follows: the government was required to establish that the yola was a vessel without nationality. To do so, the government needed to prove both that: (1) "the master or individual in charge" made a claim of registry; and (2) "the claimed nation of registry d[id] not affirmatively and unequivocally assert that the vessel [wa]s of its nationality."  46 U.S.C. § 70502(d)(1)(C).  Martinez concedes that, under the MDLEA, "[t]he response of [the] foreign nation . . . is proved conclusively" by the USCG certification. Id. at § 70502(d)(2).  Martinez notes, however, that the only

---

[7] We acknowledge Martinez's argument that the district court violated the Sixth Amendment by using his prior conviction as a basis for applying a mandatory minimum sentence without a jury finding of proof beyond a reasonable doubt.  As Martinez concedes, we are bound by precedent to reject this argument. See United States v. Paladin, 748 F.3d 438, 451-52 (1st Cir. 2014) (citing Alleyne v. United States, 133 S. Ct. 2151 (2013)).

evidence establishing that either he or Rosario made a claim of registry was contained in the USCG certification, which stated that "[u]pon inquiry, one of the two individuals on board identified himself as the master of the vessel, and claimed Dominican nationality for the yola." Rosario contends that because neither USCG Commander Fazio, nor the USCG sailor to whom Rosario or Martinez allegedly made this statement, testified at trial, this portion of the certification constituted inadmissible hearsay. Absent this evidence, he argues, the government did not carry its burden to prove MDLEA jurisdiction.[8]

On at least two occasions, the First Circuit has considered and rejected nearly identical arguments on grounds that State Department certifications are admissible as public records. See United States v. Angulo-Hernández, 565 F.3d 2, 11 (1st Cir. 2009) (citing Federal Rule of Evidence 803(8) and holding that a State Department certification is admissible as a public record); United States v. Romero, 32 F.3d 641, 650 (1st Cir. 1994) ("The hearsay exception under [Rule 803(8)] accounts for all of the subsidiary statements relayed by the State Department operatives to the declarant . . . .").

---

[8] As we said above, our review of the district court's finding of MDLEA jurisdiction is de novo. Mitchell-Hunter, 663 F.3d at 49. The government urges us to apply plain error review, but we need not resolve this issue because we conclude that Martinez's hearsay challenge fails even under the more favorable de novo standard.

Martinez acknowledges our holding in Angulo-Hernández, but he seeks to circumvent it by drawing a distinction between hearsay statements relating to the defendant's claim of registry, and those relating to the claimed nation's response. By providing in the MDLEA that the claimed nation's response may be conclusively proven by State Department certification, Martinez argues that Congress intentionally omitted a similar provision allowing for conclusive proof of the defendant's claim of registry.

Angulo-Hernández and Romero expressly held that State Department certifications are admissible as public records. The government does not contend that those cases treat the certificate as conclusive as to whether or what claim of registry was made. But, the certificate is some evidence - and, in this case, uncontested evidence - of what claim of registry was made. In sum, in our view, the reasoning of Angulo-Hernández and Romero is sound, and we see no reason to distinguish those cases here.[9]

---

[9] We recognize that Martinez contends that a portion of the certificate should be excluded under the "law enforcement" exception to the public records exception. See Fed. R. Evid. 803(8); United States v. Dowdell, 595 F.3d 50, 70 (1st Cir. 2010). But, as we have said, aside from the name "Alicantino" painted on the yola's hull, it had no other markings and did not carry registration paperwork or a national flag. Thus, in our view, the only possible explanation for the USCG's decision to contact the Dominican authorities, which the certificate conclusively shows did occur, was a verbal claim of Dominican registry by either Martinez or Rosario. Indeed, the MDLEA provides that a vessel is stateless when no claim of registry is made. See 46 U.S.C. § 70502(d)(1)(B). Thus, Martinez's contention is of no significance to his challenge to MDLEA jurisdiction.

- 17 -

B.    The Admission of Rosario's Confession

Martinez next assigns error to the district court's admission of Rosario's confession, which he argues prejudiced him in three ways.  First, he contends that the admission of the confession violated his Sixth Amendment confrontation rights.  Second, he argues that the prosecutor committed misconduct by referencing Rosario's confession as evidence of Martinez's guilt during her closing argument.  Finally, Martinez maintains that the district court erred by denying his request for a severance.  We consider these arguments in turn.

i.    The Sixth Amendment

We begin with Martinez's claim that the district court's admission of Rosario's confession violated the Sixth Amendment. Our review of this claim is de novo, but a conviction may stand even in the face of an error, provided that the error was harmless. United States v. Vega Molina, 407 F.3d 511, 519, 524 (1st Cir.

---

We can envision only one scenario, albeit a highly unlikely one, in which a defendant may have viable grounds on which to contest the contents of a certificate as they relate specifically to his claim of registry.  Consider a defendant who maintains that although the certificate states that he made a claim of registry in Country X, he actually made a claim of registry in Country Y and the USCG then contacted the wrong nation.  This unlikely scenario is the only one we can foresee in which a defendant would have a basis on which to challenge statements in the certificate describing his claim of registry.  Such a challenge, to the extent that one was to arise, would be properly brought on the basis of the USCG's failure to comply with the substantive provisions of the MDLEA.  See Maynard, 888 F.2d at 927.

2005).

The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  "The primary purpose of confrontation is 'to secure for the opponent the opportunity of cross-examination.'"  United States v. Celestin, 612 F.3d 14, 19 (1st Cir. 2010) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986)).  Thus, except in limited circumstances, "out-of-court statements of a non-testifying defendant . . . may not be used against a jointly tried codefendant."  Vega Molina, 407 F.3d at 518-19.

A trio of Supreme Court cases has shaped the law on the admissibility of extrajudicial confessions in multi-defendant cases.  In Bruton v. United States, 391 U.S. 123 (1968), the Supreme Court found that a non-testifying codefendant's "powerfully incriminating" confession, which "expressly implicat[ed]" a jointly-tried defendant, was inadmissible, reasoning that "in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for [the jointly-tried defendant's] constitutional right of cross-examination." Id. at 124 n.1, 135-37.  Later, however, the Supreme Court declined to find a Bruton error where a codefendant's confession had been redacted to eliminate any reference to the defendant, even though the confession implicated the defendant when linked to other

evidence offered at trial.  See Richardson v. Marsh, 481 U.S. 200, 208 (1987).  Finally, a third case, Gray v. Maryland, 523 U.S. 185 (1998), focused on the methods used by the prosecution to redact a codefendant's confession, and the risk that the jury might infer that a jointly-tried defendant was the subject of the redaction. See id. at 196 ("The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately . . . .").

Rosario's confession was described to the jury by DEA Agent Torres, who offered the following summary:

> According to Mr. Rosario . . . on August 15, 2012, he received a call from the other drug associates that he needed to . . . be at a meeting in the Higuey area of the Dominican Republic.  He attended the meeting with his associates.  And from that meeting, it was agreed for him to move to another location.  Prior to moving to that location, he indicated that he saw the bales [of cocaine].  From there it was agreed for him to move to the area of Valla Hibe, where he moved.  And at that location they got the boat, the vessel, the yola. . . . And Mr. Rosario moved to an island by the name of Isla Sabana, Valla Hibe.  And from there . . . Mr. Rosario received the drug load, the cocaine.  And Mr. Rosario from there departed to Puerto Rico.[10]

Martinez argues that although Torres offered a sanitized version of Rosario's confession, it was nevertheless "powerfully incriminating" because of the circumstances under which Martinez

_____

[10] Before Torres testified, the district court instructed him not to reveal that Rosario's confession implicated Martinez.

and Rosario were apprehended and tried. More specifically, Martinez notes that he and Rosario were tried together as the sole defendants in a drug conspiracy case, after having been found aboard the yola in the middle of the ocean throwing cocaine into the sea. Martinez observes that Rosario's confession provided the only explanation of how he found himself in that unfortunate predicament. He argues, in other words, that the jury could easily and immediately infer that he was the "associate" referred to in Rosario's confession, or that he was otherwise a knowing and willing participant in the conspiracy.

Assessing a claimed Bruton error entails a fact- and context-specific inquiry. See Vega Molina, 407 F.3d at 520 ("The application of Bruton, Richardson, and Gray to redacted statements . . . requires careful attention to both text and context, that is, to the text of the statement itself and to the context in which it is proffered."); United States v. Schwartz, 541 F.3d 1331, 1351 (11th Cir. 2008) ("[A] defendant's confrontation right is violated when the court admits a codefendant statement that, in light of the Government's whole case, compels a reasonable person to infer the defendant's guilt." (footnote omitted)). "A particular case may involve numerous events and actors, such that no direct inference plausibly can be made that a neutral phrase like 'another person' refers to a specific codefendant." Vega Molina, 407 F.3d at 520. Or, "[a] different case may involve so few defendants

that the statement leaves little doubt in the listener's mind about the identity of 'another person.'"  Id.

Here, we need not decide whether the admission of Rosario's confession constituted a Bruton error because we conclude that, even if it was, the government has nonetheless carried its burden to show that any such error was harmless beyond a reasonable doubt.  See United States v. Cabrera-Rivera, 583 F.3d 26, 36 (1st Cir. 2009); Vega Molina, 407 F.3d at 524.  In assessing harmlessness, we consider, among other factors, the overall strength of the evidence and the centrality of the confession to the prosecution's case.  Cabrera-Rivera, 583 F.3d at 36.

As an initial matter, Agent Torres's description of Rosario's confession was but one component of the government's case.  Rather than building its case with the confession as its cornerstone, the government instead largely trained its focus on the events leading up to and during the interdiction of the yola, as recounted by USCG personnel who were directly involved.

What is more, even setting aside Rosario's confession, the evidence of Martinez's guilt on both counts of the indictment was overwhelming.  The location and circumstances of Martinez and Rosario's apprehension, as conveyed to the jury in extensive detail, effectively shut the door on any explanation other than a conspiratorial effort to import cocaine from the Dominican Republic to Puerto Rico.  Martinez and Rosario were discovered in

the middle of a roughly eighty-mile stretch of open ocean heading in the direction of Puerto Rico. When USCG personnel aboard a patrol airplane first spotted them, they began to jettison vast quantities of cocaine from their small, open vessel. That vessel, some twenty-one feet in length, was underpowered, with a single outboard engine, and was leaking to the point that Martinez and Rosario were forced to bail water with a bucket in an ultimately futile attempt to keep it from sinking. In a word, the yola was hardly seaworthy and, in any event, had no apparent business being in the middle of the ocean.

The only other possible explanation for Martinez's presence on the yola was that he had simply hitched a ride from the Dominican Republic to Puerto Rico without knowing that there were vast quantities of cocaine onboard. Given the size, layout, and condition of the yola, and the distance of the passage, this explanation is laughably implausible.[11] We thus conclude that, even if the district court's admission of Rosario's confession constituted a Bruton error (an issue we do not decide), any such

---

[11] The explanation is even more implausible when considered in light of the record. The jury heard testimony from law enforcement officers that yolas used to smuggle drugs carry at least two crewmen, in order to prevent one from absconding with the product. On top of that, the evidence showed that the yola was an open vessel with nowhere for Rosario to hide the cocaine from Martinez even if he tried. One of the USCG airmen testified that the bales were visible from the air near the yola's bow. Indeed, even Martinez did not make that argument.

- 23 -

error was harmless because there is no reasonable possibility that the confession here contributed to the conviction.  See Schneble v. Florida, 405 U.S. 427, 432 (1972).

### ii.  The Prosecutor's Closing Argument

Martinez next claims that the prosecutor committed misconduct during her closing argument by urging the jury to convict him on the basis of Rosario's confession, a line of argument that Bruton and its progeny plainly prohibit.  See Vega Molina, 407 F.3d at 522 (assigning error where the prosecutor's closing argument "specifically mentioned [a codefendant's] confession and implored the jury to infer that the 'another person' reference in the redacted confession was, in fact, a reference to [the defendant]").  Martinez did not lodge a contemporaneous objection at trial, so our review is for plain error.  United States v. Kasenge, 660 F.3d 537, 541 (1st Cir. 2011).  To prevail, Martinez must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).

The relevant portion of the prosecutor's closing argument is as follows:

> [W]e heard testimony [Rosario] admitted his involvement in this scheme. . . . And of course we can't take that statement and apply it to the other

defendant. So, let's look at some of the facts that will help you decide was [Martinez] just getting a ride to Puerto Rico? . . . Ladies and gentlemen, I submit that there's ample . . . circumstantial evidence that [Martinez] was on that vessel knowing there were drugs onboard - he was sitting on top of them or they were right in front of him - and he threw them overboard when the law enforcement came. And we know that he entered into this agreement by the surrounding circumstances because what were they going to do when they arrived to Puerto Rico? . . . They were bringing [the drugs] to Puerto Rico to give them to someone else. . . . And you also heard from multiple law enforcement witnesses that . . . they have never been involved in [an] interdiction with just one person on the boat. It's always multiple people . . . because you need someone to make sure the other guy isn't going to steal $2 million worth of drugs. So, ladies and gentlemen, those are the facts. . . . And, again, I will submit that the totality of the circumstances, the circumstantial evidence along with the direct evidence such as [Rosario's] incriminating statements with regards to his actions support a finding of guilt with regards to both defendants entering into agreements to commit those two offenses.

Martinez claims that the prosecutor's closing argument constituted misconduct both because its factual content was drawn from Rosario's confession, and because its concluding sentence expressly urged the jury to convict Martinez on the basis of the confession. We have considered both arguments, but conclude that there was no error, much less one that was clear or obvious. First, contrary to Martinez's claim, the factual content of the closing argument was drawn not from the confession, but from other evidence at trial. For example, as we have said, the jury heard testimony that the cocaine was plainly visible aboard the yola,

and that there are usually at least two crewmen aboard yolas used to smuggle drugs. The prosecutor's closing argument fairly drew on this evidence to argue that Martinez was a participant in the conspiracy, rather than simply an innocent passenger.

What is more, while the last sentence of the above-cited excerpt may have been confusingly phrased, it does not appear to us to have been an attempt by the prosecutor to urge Martinez's conviction on the basis of Rosario's confession. Rather, the prosecutor laid out three bases on which the jury could return guilty verdicts: (1) "the totality of the circumstances"; (2) "the circumstantial evidence"; and (3) "the direct evidence such as [Rosario's] incriminating statements with regards to his actions." (emphasis added). It thus appears that the prosecutor urged the jury to use Rosario's confession as evidence of his guilt, and the totality of the circumstances and the circumstantial evidence as evidence of the guilt of both defendants. This interpretation is particularly logical in light of the prosecutor's earlier admonition that "we can't take [Rosario's] statement and apply it to [Martinez]." See United States v. Sepulveda, 15 F.3d 1161, 1187 (1st Cir. 1993) ("[I]n the absence of a contemporaneous objection it seems fair to give the arguer the benefit of every plausible interpretation of her words."). In sum, we do not discern clear or obvious error on the part of the district court in failing to identify and sua sponte remedy this statement.

- 26 -

iii. <u>Severance</u>

Finally, Martinez contends that the district court erred by denying his requests for a severance. "We review a severance ruling 'for any manifest abuse of discretion which deprived appellant of a fair trial and resulted in a miscarriage of justice.'" <u>Celestin</u>, 612 F.3d at 19 (quoting <u>United States</u> v. <u>Peña-Lora</u>, 225 F.3d 17, 33 (1st Cir. 2000)).

We have already concluded that, even if the district court's admission of Rosario's confession constituted a <u>Bruton</u> error, any such error was harmless. For the same reasons, we conclude that Martinez cannot demonstrate that the denial of a severance deprived him of a fair trial or resulted in a miscarriage of justice. <u>See</u> <u>United States</u> v. <u>McLaughlin</u>, 957 F.2d 12, 18 (1st Cir. 1992) (noting a defendant "must make a strong showing of prejudice" to prevail on an appeal from the denial of a motion to sever).

## IV. Conclusion

For the foregoing reasons, the defendants' convictions are AFFIRMED.